## UNITED STATES v. NORTHERN SECURITIES CO. et al.

(Circuit Court, D. Minnesota, Third Division. April 9, 1903.)

### No. 789.

**1. MONOPOLIES—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE—CONSTRUCTION OF ANTI-TRUST LAW.**

The generality of the language used in the anti-trust act of 1890 (Act July 2, 1890, 26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), declaring illegal "every contract, combination or conspiracy in restraint of trade or commerce among the several states or with foreign nations," indicates the purpose of Congress to include in the prohibition every combination which directly and substantially restricts interstate commerce, whatever its form.

**2. SAME—APPLICATION OF ACT TO INTERSTATE CARRIERS.**

The anti-trust act (Act July 2, 1890, 26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]) applies to interstate carriers of freight and passengers, and any contract or combination which directly and substantially restricts the right of such a carrier to fix its own rates, independently of its natural competitors, places a direct restraint upon interstate commerce, in that it tends to prevent competition, and is in violation of the act, whether the rates actually fixed be reasonable or unreasonable.

**3. SAME—CORPORATION TO ACQUIRE STOCK OF COMPETING RAILROADS—LEGALITY.**

The real control of a corporation is in its stockholders, who have the power to determine all important corporate acts and policies, and any contract or combination by which a majority of the stock of two railroad companies owning and operating parallel and competing interstate lines of road is transferred to a corporation organized for the purpose of holding and voting the same, and receiving the dividends thereon, to be divided pro rata among the stockholders of the two companies so transferring their stock, directly and substantially restricts interstate trade and commerce, and is in violation of the anti-trust act (Act July 2, 1890, 26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), since it destroys any motive for competition between the two roads; and it is immaterial that each company has its own board of directors, which nominally directs its operations and fixes its rates.

**4. CORPORATIONS—POWERS—NEW JERSEY STATUTES.**

The language of the New Jersey enabling act (Laws 1899, p. 473), authorizing the organization of corporations "for any lawful purpose," imposes a limitation upon the powers of any corporation organized thereunder, however broad may be the terms of its articles of incorporation.

**5. SAME—INTERSTATE COMMERCE.**

A state cannot invest a corporation organized under its laws with the power to do acts in the corporate name which would operate to restrain interstate commerce.

**6. CONSTITUTIONAL LAW—RIGHT OF PRIVATE CONTRACT—LIMITATION BY INTERSTATE COMMERCE CLAUSE.**

The constitutional guaranty of liberty to the individual to enter into private contracts is limited to some extent by the commerce clause of the Constitution, and Congress may, in the exercise of the power conferred by such clause, prohibit private contracts which operate to directly and substantially restrain interstate commerce.

**7. MONOPOLIES—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE—SUIT TO ENJOIN.**

The fact that the purpose of an illegal combination between stockholders of two railroad companies operating parallel and competing interstate lines, to secure unity of interest and control of such companies, and to prevent competition, has been accomplished by the formation of a corporation which has acquired the ownership of a majority of the stock of each of the companies, cannot be urged to defeat a suit by the United States to restrain the exercise of the power so illegally acquired

120 F.—46

by the corporation through such combination, as imposing a restraint upon interstate commerce in violation of the anti-trust law (Act July 2, 1890, 26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]).

8. SAME—DEFENSES—QUESTIONS OF PUBLIC POLICY.

Where the effect of a combination is to directly prevent competition between two parallel and naturally competing lines of railroad engaged in interstate business, it is in restraint of interstate commerce, and a violation of the anti-trust act (Act July 2, 1890, 26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200]), and the court, in a suit to enjoin it as such, cannot consider the question whether the combination may not be of greater benefit to the public than competition would be; that being a question of public policy, to be determined by Congress.

In Equity.

Philander C. Knox, Atty. Gen., D. T. Watson, Special Counsel, James M. Beck and W. A. Day, Asst. Attys. Gen., and John M. Freeman, for the United States.

George B. Young and John W. Griggs, for the Northern Securities Company.

George B. Young, for James J. Hill, William P. Clough, D. Willis James, John S. Kennedy, and George F. Baker.

M. D. Grover, for the Great Northern Railway Company.

C. W. Bunn, for the Northern Pacific Railway Company.

Francis Lynde Stetson and David Willcox, for defendants Morgan, Bacon, and Lamont.

Before CALDWELL, SANBORN, THAYER, and VANDE-VANTER, Circuit Judges.

THAYER, Circuit Judge. This is a bill, exhibited by the United States, to restrain the violation of an act of Congress approved July 2, 1890, 26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200], entitled "An act to protect trade and commerce against unlawful restraints and monopolies," which is commonly termed the "Sherman Anti-Trust Act." The case was heard before a Circuit Court composed of the four Circuit Judges of the Eighth Circuit, pursuant to the provisions of a recent act of Congress, approved February 11, 1903, which requires such cases to be heard "before not less than three of the Circuit Judges" of the Circuit where the suit is brought, when the Attorney General files with the clerk of the court wherein the case is pending, a certificate that it is one of "general public importance." Such a certificate has been filed, and in accordance with the mandate of the statute the case "has been given precedence over others and in every way expedited."

From admissions made by the pleadings, as well as from much oral testimony, we reach the following conclusions as respects matters of fact:

Two of the defendants, namely, the Northern Pacific Railway Company and the Great Northern Railway Company, are the owners, respectively, of lines of railroad which extend from the cities of Duluth, St. Paul, and Minneapolis, in the state of Minnesota; thence across the continent to Puget Sound. These roads are, and in public estimation have ever been regarded as, parallel and competing lines. For some years, at least, after they were built, they competed with each other actively for transcontinental and interstate traffic.

In the spring of the year 1901 they united in purchasing about 98 per cent. of the entire capital stock of the Chicago, Burlington & Quincy Railway Company, and became joint sureties for the payment of bonds of the last-named company, whereby the purchase was accomplished, which were to run 20 years, and bear 4 per cent. interest per annum. The amount of stock so acquired was of the par value of about $107,000,000, and, as it was purchased at the rate of $200 per share, the bonded indebtedness of the two companies was thus increased to the extent of $200,000,000.

Subsequent to the acquisition of the stock of the Burlington Company, and in the summer of the year 1901, certain large and influential stockholders of the Northern Pacific and Great Northern Companies, who had practical control of the two roads, and who have been made parties defendant to the present bill, acting in concert with each other, conceived the design of placing a very large majority of the stock of both of the last-named companies in the hands of a single owner. To this end these stockholders arranged and agreed with each other to procure and cause the formation of a corporation under the laws of the state of New Jersey, which latter company, when organized, should buy all or at least the greater part of the stock of the Northern Pacific and Great Northern Companies. The individuals who conceived and promoted this plan agreed with each other to exchange their respective holdings of stock in the last-named railroad companies for the stock of the New Jersey company, when the same should be fully organized, and to use their influence to induce other stockholders in their respective companies to do likewise, to the end that the New Jersey company might become the sole owner of the whole, or at least a major portion, of the stock of both railroad companies.

In accordance with this plan the defendant the Northern Securities Company (hereafter termed the "Securities Company") was organized under the laws of the state of New Jersey on November 13, 1901, with a capital stock of $400,000,000, that sum being the exact amount required to purchase the total stock of the two railroad companies at the price agreed to be paid therefor. When the Securities Company was organized, it assented to and became a party to the scheme that had been devised by its promoters before it became a legal entity.

Very shortly after its organization the Securities Company acquired a large majority of all the stock of the Northern Pacific Company at the rate of $115 per share, paying therefor in its own stock at par. At the same time it acquired about 300,000 shares of the stock of the Great Northern Company from those stockholders of that company who had been instrumental in organizing the Securities Company, paying therefor at the rate of $180 per share, and using its own stock at par to make the purchase.

The Securities Company subsequently made further purchases of stock of the Great Northern Company at the same rate, and in about three months had acquired stock of the latter company, amounting at par to about $95,000,000, using for that purpose its own stock to the amount of about $171,000,000. The Securities Company was enabled to make the subsequent purchase of stock from stockholders

of the Great Northern Company not immediately concerned in the organization of the Securities Company by the advice, procurement, and persuasion of those stockholders of the Great Northern Company who had been instrumental in organizing the Securities Company, and had exchanged their own stock for stock in that company shortly after its organization. At the present time the Securities Company is the owner of about 96 per cent. of all the stock of the Northern Pacific Company, and the owner of about 76 per cent. of all the stock of the Great Northern Company.

The scheme which was thus devised and consummated led inevitably to the following results: First, it placed the control of the two roads in the hands of a single person, to wit, the Securities Company, by virtue of its ownership of a large majority of the stock of both companies; second, it destroyed every motive for competition between two roads engaged in interstate traffic, which were natural competitors for business, by pooling the earnings of the two roads for the common benefit of the stockholders of both companies; and, according to the familiar rule that every one is presumed to intend what is the necessary consequence of his own acts when done willfully and deliberately, we must conclude that those who conceived and executed the plan aforesaid intended, among other things, to accomplish these objects.

The general question of law arising upon this state of facts is whether such a combination of interests as that above described falls within the inhibition of the anti-trust act or is beyond its reach. The act brands as illegal "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations." Learned counsel on both sides have commented on the general language of the act, doing so, of course, for a different purpose, and the generality of the language employed is, in our judgment, of great significance. It indicates, we think, that Congress, being unable to foresee and describe all the plans that might be formed and all the expedients that might be resorted to to place restraints on interstate trade or commerce, deliberately employed words of such general import as, in its opinion, would comprehend every scheme that might be devised to accomplish that end.

What is commonly termed a "trust" was a species of combination organized by individuals or corporations for the purpose of monopolizing the manufacture of or traffic in various articles and commodities, which was well known and fully understood when the anti-trust act was approved. Combinations in that form were accordingly prohibited; but Congress, evidently anticipating that a combination might be otherwise formed, was careful to declare that a combination in any other form, if in restraint of interstate trade or commerce—that is, if it directly occasioned or effected such restraint—should likewise be deemed illegal.

Moreover, in cases arising under the act, it has been held by the highest judicial authority in the nation, and its opinion has been reiterated in no uncertain tone, that the act applies to interstate carriers of freight and passengers as well as to all other persons, natural or artificial; that the words "in restraint of trade or commerce" do not

mean in unreasonable or partial restraint of trade or commerce, but any direct restraint thereof; that an agreement between competing railroads, which requires them to act in concert in fixing the rate for the carriage of passengers or freight over their respective lines from one state to another, and which, by that means, restricts temporarily the right of any one of such carriers to name such rates for the carriage of such freight or passengers over its road as it pleases, is a contract in direct restraint of commerce within the meaning of the act, in that it tends to prevent competition; that it matters not whether, while acting under such a contract, the rate fixed is reasonable or unreasonable, the vice of such a contract or combination being that it confers the power to establish unreasonable rates, and directly restrains commerce by placing obstacles in the way of free and unrestricted competition between carriers who are natural rivals for patronage; and, finally, that Congress has the power, under the grant of authority contained in the federal Constitution, to regulate commerce, to say that no contract or combination shall be legal which shall restrain interstate trade or commerce by shutting off the operation of the general law of competition. United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Ass'n, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136.

Taking the foregoing propositions for granted, because they have been decided by a court whose authority is controlling, it is almost too plain for argument that the defendants would have violated the anti-trust act if they had done, through the agency of natural persons, what they have accomplished through an artificial person of their own creation. That is to say, if the same individuals who promoted the Securities Company, in pursuance of a previous understanding or agreement so to do, had transferred their stock in the two railroad companies to a third party or parties, and had agreed to induce other shareholders to do likewise, until a majority of the stock of both companies had been vested in a single individual or association of individuals, and had empowered the holder or holders to vote the stock as their own, receive all the dividends thereon, and prorate or divide them among all the shareholders of the two companies who had transferred their stock—the result would have been a combination in direct restraint of interstate commerce, because it would have placed in the hands of a small coterie of men the power to suppress competition between two competing interstate carriers, whose lines are practically parallel.

It will not do to say that, so long as each railroad company has its own board of directors, they operate independently, and are not controlled by the owner of the majority of their stock. It is the common experience of mankind that the acts of corporations are dictated and that their policy is controlled by those who own the majority of their stock. Indeed, one of the favorite methods in these days, and about the only method, of obtaining control of a corporation, is to purchase the greater part of its stock. It was the method pursued by the Northern Pacific and Great Northern Companies to obtain control of the Chicago, Burlington & Quincy Railroad; and, so

long as directors are chosen by stockholders, the latter will necessarily dominate the former, and in a real sense determine all important corporate acts.

The fact that the ownership of a majority of the capital stock of a corporation gives one the mastery and control of the corporation was distinctly recognized and declared in Pearsall v. Great Northern Railway, 161 U. S. 646, 671, 16 Sup. Ct. 705, 710, 40 L. Ed. 838. The same fact has been recognized and declared by other courts. Pennsylvania R. Co. v. Commonwealth (Pa.) 7 Atl. 368, 371; Farmers' Loan & Trust Co. v. New York & Northern Railway Co., 150 N. Y. 410, 425, 44 N. E. 1043, 34 L. R. A. 76; People ex rel. v. Chicago Gas Trust Co., 130 Ill. 268, 22 N. E. 798, 802, 8 L. R. A. 497, 17 Am. St. Rep. 319. In opposition to this view counsel cite Pullman Car Co. v. Missouri Pacific Co., 115 U. S. 587, 596, 6 Sup. Ct. 194, 29 L. Ed. 499, but in that case the meaning of the word "controlled," as used in a private contract, was the point under consideration, and what was said on the subject cannot be held applicable to cases arising under the anti-trust act, when the point involved is whether the ownership of all of the stock of two competing and parallel railroads vests the owner thereof with the power to suppress competition between such roads. We entertain no doubt that it does. Indeed, we regard the suppression of competition, and to that extent a restraint of commerce, as the natural and inevitable result of such ownership.

What has been done through the organization of the Securities Company accomplishes the object which Congress has denounced as illegal more effectually, perhaps, than such a combination as is last supposed. That is to say, by what has been done the power has been acquired (and provision made for maintaining it) to suppress competition between two interstate carriers who own and operate competing and parallel lines of railroad. Competition, we think, would not be more effectually restrained than it now is under and by force of the existing arrangement if the two railroad companies were consolidated under a single charter.

It is manifest, therefore, that the New Jersey charter is about the only shield which the defendants can interpose between themselves and the law. The reasoning which led to the acquisition of that charter would seem to have been that while, as individuals, the promoters could not, by agreement between themselves, place the majority of the stock of the two competing and parallel railroads in the hands of a single person or a few persons, giving him or them the power to operate the roads in harmony, and stifle competition, yet that the same persons might create a purely fictitious person termed a corporation, which could neither think nor act except as they directed, and, by placing the same stock in the name of such artificial being, accomplish the same purpose. The manifest unreasonableness of such a proposition, and the grave consequences sure to follow from its approval, compel us to assume that it must be unsound, especially when we reflect that the law, as administered by courts of equity, looks always at the substance of things—at the object accomplished, whether it be lawful or unlawful—rather than upon the particular devices or means by which it has been accomplished.

So far as the New Jersey charter is concerned, the question, broadly stated, which the court has to determine, is whether a charter granted by a state can be used to defeat the will of the national legislature as expressed in a law relating to interstate trade and commerce over which Congress has absolute control. Presumptively, at least, no charter granted by a state is intended by the state to have that effect or to be used for such a purpose; and in the present instance it is clear that the state of New Jersey did not intend to grant a charter under cover of which an object denounced by Congress as unlawful, namely, a combination conferring the power to restrain interstate commerce might be formed and maintained because the enabling act under which the Securities Company was organized expressly declares that three or more persons may avail themselves of the provisions of the act and "become a corporation for any lawful purpose." Laws N. J. 1899, p. 473. This language is not merely perfunctory. It means, obviously, that, whatever powers the incorporators saw fit to assume, they must hold and exercise for the accomplishment of lawful objects. The words in question operate, therefore, as a limitation upon all the powers enumerated in the articles of association which were filed by the promoters of the Securities Company, so that, however extensive and comprehensive these powers may seem to be, the state of New Jersey has said, "You shall not exercise them so as to set at defiance any statute lawfully enacted by the Congress of the United States, or any statute lawfully enacted by any state wherein you see fit to exercise your powers."

But aside from this view of the subject, if the state of New Jersey had undertaken to invest the incorporators of the Securities Company with the power to do acts in the corporate name which would operate to restrain interstate commerce, and for that reason could not be done by them acting as an association of individuals, then we have no doubt that such a grant would have been void under the provisions of the anti-trust act, or at least that the charter could not be permitted to stand in the way of the enforcement of that act.

The power of Congress over interstate commerce is supreme, far-reaching, and acknowledges no limitations other than such as are prescribed in the Constitution itself. Gibbons v. Ogden, 9 Wheat. 1, 197, 6 L. Ed. 23; County of Mobile v. Kimball, 102 U. S. 691, 696, 697, 26 L. Ed. 238; Champion v. Ames (decided Feb. 23, 1903) 23 Sup. Ct. 321, 47 L. Ed. ——. No legislation on the part of a state can curtail or interfere with its exercise; and, in view of repeated decisions, no one can deny that it is a legitimate exercise of the power in question for Congress to say that neither natural nor artificial persons shall combine or conspire in any form whatever to place restraints on interstate trade or commerce. United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136.

It is urged, however, that such a combination of adverse interests as was formed, and has been heretofore described, was lawful, and not prohibited by the anti-trust act, because such restraint upon interstate trade or commerce, if any, as it imposes, is indirect, collateral,

and remote, and hence that the combination is not one of that character which the Congress of the United States can lawfully forbid. The following cases are relied upon to sustain the contention: United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290; Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300. It is pertinent, therefore, to inquire in what way the existing combination that has been formed does affect interstate commerce. It affects it, we think, by giving to a single corporate entity, or, more accurately, to a few men acting in concert and in its name and under cover of its charter, the power to control all the means of transportation that are owned by two competing and parallel railroads engaged in interstate commerce; in other words, the power to dictate every important act which the two companies may do, to compel them to act in harmony in establishing interstate rates for the carriage of freight and passengers, and generally to prescribe the policy which they shall pursue. It matters not, we think, through how many hands the orders come by which these aims are accomplished, or through what channels. The power was not only acquired by the combination, but it is effectually exercised, and it operates directly on interstate commerce, notwithstanding the manner of its exercise, by controlling the means of transportation, to wit, the cars, engines, and railroads by which persons and commodities are carried, as well as by fixing the price to be charged for such carriage.

The cases cited above, and on which reliance is placed to sustain the view that the restraint imposed is merely indirect, remote, incidental, or collateral, are not relevant, for, as was fully explained in Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 238, 240, 243, 20 Sup. Ct. 96, 44 L. Ed. 136, one of these cases (United States v. E. C. Knight Company) dealt only with a combination within a state to obtain a practical monopoly of the manufacture of sugar, and it was held that the combination only related to manufacture, and not to commerce among the states or with foreign nations; that the fact that an article was manufactured for export to another state did not make it an article of interstate commerce before transportation had been begun, or necessarily subject it to federal control; and that the effect of the combination then under consideration on interstate commerce was at most only incidental and collateral. But while commenting on its previous decision in United States v. E. C. Knight Co., the court took occasion to say, in Addyston Pipe & Steel Co. v. United States, 175 U. S. 246, 20 Sup. Ct. 96, 44 L. Ed. 136, that, when a contract is made for the sale and delivery of an article in another state, the transaction is one of interstate commerce, although the vendor has also agreed to manufacture the article so sold, and that combinations to control and monopolize such transactions would be in restraint of interstate commerce.

In the other cases (Hopkins v. United States and Anderson v. United States) it was held that the business of the members of the Kansas City Live Stock Exchange, which was under consideration by the court, was not interstate commerce and that the act did not affect them, and that, even if they were so affected, the particular agree-

ment which was involved did not operate as a restraint of interstate commerce.

We fail to find in either of these cases any suggestion that a combination such as the one in hand, the object and necessary effect of which is to give to a single person or to a coterie of persons full control of all the means of transportation owned by two competing and parallel lines of road engaged in interstate commerce, as well as the power to fix the rate for the transportation of persons and property, does not directly and immediately affect interstate commerce. No combination, as it would seem, could more immediately affect it.

Again, it is urged tentatively that, if the existing combination which the government seeks to have dissolved is held to be one in violation of the anti-trust act and unlawful, then the act unduly restricts the right of the individual to make contracts, buy and sell property, and is invalid for that reason. With reference to this contention it might be suggested (as it has been by the government) that, as the situs of the stock which the Securities Company has bought is in the states of Wisconsin and Minnesota, which respectively chartered the Northern Pacific and Great Northern Companies, and as the stock owes its being to the laws of those states, and as each state has forbidden the consolidation of competing and parallel lines of railroad therein, and has likewise prohibited any consolidation of the "stock and franchises" of such roads, the contention last mentioned is entitled to little consideration in the case at bar.

. But waiving and ignoring this suggestion, the argument advanced in behalf of the defendants is met and answered, so far as this court is concerned, by the decision in Addyston Pipe & Steel Co. v. United States, 175 U. S. 228, 229, 20 Sup. Ct. 96, 102, 44 L. Ed. 136, where it is said, inter alia:

"Under this grant of power to Congress (the power to regulate commerce between the several states and with foreign nations), that body, in our judgment, may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations where the natural and direct effect of such a contract will be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate, to any substantial extent, interstate commerce. * * * We do not assent to the correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts, limits the power of Congress and prevents it from legislating on the subject of contracts of the class mentioned. * * * It has been held that the word 'liberty,' as used in the Constitution, was not to be confined to the mere liberty of persons, but included, among others, a right to enter into certain classes of contracts for the purpose of enabling the citizen to carry on his business. * * * But it has never been, and in our opinion ought not to be held, that the word included the right of an individual to enter into private contracts upon all subjects, no matter what their nature, and wholly irrespective, among other things, of the fact that they would, if performed, result in the regulation of interstate commerce, and in violation of an act of Congress upon that subject. The provision of the Constitution does not, as we believe, exclude Congress from legislating with regard to contracts of the above nature while in the exercise of its constitutional right to regulate commerce among the states. On the contrary, we think the provision regarding the liberty of the citizen is to some extent limited by the commerce clause of the Constitution, and that the power of Congress to regulate interstate commerce comprises the right to enact a law prohibiting the citizen from entering into those private contracts which directly and substantially, and not merely indirectly, remotely, incidentally, and collaterally, regulate

to a greater or less degree commerce among the states. We cannot so enlarge the scope of the language of the Constitution regarding the liberty of the citizen as to hold that it includes, or that it was intended to include, a right to make a contract which in fact restrained and regulated interstate commerce, notwithstanding Congress, proceeding under the constitutional provision giving to it the power to regulate that commerce, had prohibited such contracts."

These observations, as a matter of course, preclude further controversy over the power of Congress to limit to some extent the right to make contracts when enacting laws for the regulation of commerce between the states.

Learned counsel for the defendants further contend as follows: That the anti-trust act was not intended to include or prohibit combinations looking to the virtual consolidation of parallel and competing lines of railroad, although such a combination operates to stifle competition; that no relief can be granted to the government in this instance, because the combination or conspiracy of which it complains had accomplished its purpose, to wit, the organization of the Securities Company and the lodgment of the majority of the stock of the two railroads in its hands before the bill was filed; and, finally, that the combination proven was one "formed in aid of commerce and not to restrain it"; in other words, that it was one formed to enlarge the volume of interstate traffic and thus benefit the public.

The court cannot assent to either of these propositions.

The first, we think, is clearly untenable for the reasons already stated and fully disclosed in the decisions heretofore cited.

Concerning the second contention, we observe that it would be a novel, not to say absurd, interpretation of the anti-trust act to hold that after an unlawful combination is formed and has acquired the power which it had no right to acquire, namely, to restrain commerce by suppressing competition, and is proceeding to use it and execute the purpose for which the combination was formed, it must be left in possession of the power that it has acquired, with full freedom to exercise it. Obviously the act, when fairly interpreted, will bear no such construction. Congress aimed to destroy the power to place any direct restraint on interstate trade or commerce, when by any combination or conspiracy, formed by either natural or artificial persons, such a power had been acquired; and the government may intervene and demand relief as well after the combination is fully organized as while it is in process of formation. In this instance, as we have already said, the Securities Company made itself a party to a combination in restraint of interstate commerce, that antedated its organization, as soon as it came into existence, doing so, of course, under the direction of the very individuals who promoted it.

Relative to the third contention, which has been pressed with great zeal and ability, this may be said: It may be that such a virtual consolidation of parallel and competing lines of railroad as has been effected, taking a broad view of the situation, is beneficial to the public rather than harmful. It may be that the motives which inspired the combination by which this end was accomplished were wholly laudable and unselfish; that the combination was formed by the individual defendants to protect great interests which had been committed to their charge; or it may be that the combination was the initial

and a necessary step in the accomplishment of great designs, which, if carried out as they were conceived, would prove to be of inestimable value to the communities which these roads serve and to the country at large.

We shall neither affirm nor deny either of these propositions, because they present issues which we are not called upon to determine, and some of them are issues which no court is empowered to hear or decide, involving, as they do, questions of public policy which Congress must determine. It is our duty to ascertain whether the proof discloses a combination in direct restraint of interstate commerce; that is to say, a combination whereby the power has been acquired to suppress competition between two or more competing and parallel lines of railroad engaged in interstate commerce. If it does disclose such a combination—and we have little hesitation in answering this question in the affirmative—then the anti-trust act, as it has been heretofore interpreted by the court of last resort, has been violated, and the government is entitled to a decree.

A decree in favor of the United States will accordingly be entered to the following effect: Adjudging that the stock of the Northern Pacific and Great Northern Companies, now held by the Securities Company, was acquired in virtue of a combination among the defendants in restraint of trade and commerce among the several states, such as the anti-trust act denounces as illegal; enjoining the Securities Company from acquiring or attempting to acquire further stock of either of said companies; also enjoining it from voting such stock at any meeting of the stockholders of either of said railroad companies, or exercising or attempting to exercise any control, direction, supervision, or influence over the acts of said companies or either of them by virtue of its holding such stock; enjoining the Northern Pacific and Great Northern Companies, respectively, their officers, directors, and agents, from permitting such stock to be voted by the Northern Securities Company, or any of its agents or attorneys on its behalf, at any corporate election for directors or officers of either of said companies; and likewise enjoining them from paying any dividends to the Securities Company on account of said stock, or permitting or suffering the Securities Company to exercise any control whatsoever over the corporate acts of said companies, or to direct the policy of either; and, finally, permitting the Securities Company to return and transfer to the stockholders of the Northern Pacific and Great Northern Companies any and all shares of stock of those companies which it may have received from such stockholders in exchange for its own stock, or to make such transfer and assignment to such person or persons as are now the holders and owners of its own stock originally issued in exchange for the stock of said companies.

## The Decree.

It was ordered, adjudged, and decreed as follows, to wit:

That the defendants above named have heretofore entered into a combination or conspiracy in restraint of trade and commerce among the several states, such as an act of Congress, approved July 2, 1890, 26 Stat. 209, c. 647 [U. S. Comp. St. 1901, p. 3200], entitled "An act to protect trade and commerce against unlawful restraints and monop-

olies," denounces as illegal; that all of the stock of the Northern Pacific Railway Company and all the stock of the Great Northern Railway Company now claimed to be held and owned by the defendant the Northern Securities Company was acquired and is now held by it in virtue of such combination or conspiracy in restraint of trade and commerce among the several states; that the Northern Securities Company, its officers, agents, servants, and employés, be, and they are hereby, enjoined from acquiring or attempting to acquire further stock of either of the aforesaid railway companies; that the Northern Securities Company be enjoined from voting the aforesaid stock which it now holds or may acquire, and from attempting to vote it, at any meeting of the stockholders of either of the aforesaid railway companies, and from exercising or attempting to exercise any control, direction, supervision, or influence whatsoever over the acts and doings of said railway companies, or either of them, by virtue of its holding such stock therein; that the Northern Pacific Railway Company and the Great Northern Railway Company, their officers, directors, servants, and agents, be, and they are hereby, respectively and collectively enjoined from permitting the stock aforesaid to be voted by the Northern Securities Company, or in its behalf, by its attorneys or agents, at any corporate election for directors or officers of either of the aforesaid railway companies, and that they, together with their officers, directors, servants, and agents, be likewise enjoined and respectively restrained from paying any dividends to the Northern Securities Company on account of stock in either of the aforesaid railway companies which it now claims to own and hold; and that the aforesaid railway companies, their officers, directors, servants, and agents, be enjoined from permitting or suffering the Northern Securities Company, or any of its officers or agents, as such officers or agents, to exercise any control whatsoever over the corporate acts of either of the aforesaid railway companies.

But nothing herein contained shall be construed as prohibiting the Northern Securities Company from returning and transferring to the stockholders of the Northern Pacific Railway Company and the Great Northern Railway Company, respectively, any and all shares of stock in either of said railway companies which said the Northern Securities Company may have heretofore received from such stockholders in exchange for its own stock; and nothing herein contained shall be construed as prohibiting the Northern Securities Company from making such transfer and assignments of the stock aforesaid to such person or persons as may now be the holders and owners of its own stock originally issued in exchange or in payment for the stock claimed to have been acquired by it in the aforesaid railway companies.

It is further ordered and adjudged that the United States recover of and from the defendants its costs herein expended, the same to be taxed by the clerk of this court, and have execution therefor.

HENRY C. CALDWELL,<br>
Presiding Judge.<br>
WALTER H. SANBORN,<br>
AMOS M. THAYER,<br>
Circuit Judges.