GREENWICH INS. CO. et al. v. CARROLL, State Auditor.

(Circuit Court, S. D. Iowa, C. D.   October 13, 1903.)

No. 2,410.

1. **STATUTES—CONSTITUTIONALITY—IOWA INSURANCE LAW.**
    Iowa Code, §§ 1754, 1755, prohibiting combinations between fire insurance companies doing business in the state in relation to rates, agents' commissions, or the manner of transacting business in the state, and providing for the revocation by the state auditor of the permits of any companies found to have violated such prohibition, are not in violation of the provisions of the state Constitution prohibiting the granting of special privileges and immunities, and requiring that when they can be made applicable all laws shall be general and of uniform operation throughout the state.

2. **EQUITY JURISDICTION—ENJOINING ENFORCEMENT OF INVALID STATUTE.**
    A court of equity, state or federal, has jurisdiction to enjoin the enforcement of an invalid law when its enforcement would cause loss of business, expense and hardships to complainant, and result in irreparable injury.

3. **CONSTITUTIONAL LAW—LIBERTY TO CONTRACT—IOWA INSURANCE STATUTE.**
    The provisions of Iowa Code, § 1754, which make it unlawful for two or more fire insurance companies doing business in the state to enter into any agreement as to the amount of commissions to be allowed agents or as to the manner of transacting fire insurance business in the state, are invalid as depriving insurance companies of the liberty to contract secured to all persons by the fourteenth constitutional amendment and of the equal protection of the laws.

¶ 2. See Injunction, vol. 27, Cent. Dig. § 156.

In Equity.   On demurrer to bill.

James C. Davis and George H. Carr, for complainants.
Charles W. Mullan, Atty. Gen., for defendant.

McPHERSON, District Judge.   This case is pending on defendant's demurrer to a bill in equity, filed by a number of foreign fire insurance companies, against the defendant, who is Auditor of the state and Insurance Commissioner.   The bill asks that defendant be restrained from taking action against them under certain statutes of the state, alleging that the statutes in question are void because in conflict with both the state and federal Constitutions.   It is alleged that all these companies have been engaged in doing a fire insurance business in the state for a great many years, paying the fees and taxes, and in all respects complying with the laws relating to such companies; and it is also alleged that, prior to the adoption of the statutes in question, they had established their business in equipping offices, paying out large sums in advertising and so on, and from year to year, including the current year, they having fully complied with the laws of the state in making their reports as well as all other things, and the Auditor gave each of them a certificate authorizing them to continue in business.   They each have an extensive business in Iowa, carrying large and numerous risks on property in the state.   It is alleged that there are 85 foreign companies, including complainants, doing business in the state, and which pay to the state annually large sums as fees and taxes.

The statutes complained of were enacted in the year 1896, and are now parts of the Code, being as follows:   Section 1754 provides that it shall be unlawful for two or more fire insurance companies doing business in this state, or for the officers, agents, or employés, to make or enter into any combination or agreement relating to the rates to be charged for insurance, the amounts of commissions to be allowed agents for procuring the same, or the manner of transacting fire insurance in this state.   Penalties and fines are to be imposed for a violation of the statute.   Section 1755 provides that the Auditor shall summon before him and examine under oath all those he suspects of violating the statute; and if they fail to appear, or if he finds that they are doing the things inhibited, he shall revoke their permits to do business, and thereafter they shall not do business in the state.   It is alleged that the Auditor is about to proceed against them, and that he will oust them from the state unless he is restrained.

The first question presented is, are the statutes in conflict with the state Constitution?   Section 6, art. 1, provides that all laws of a general nature shall have uniform operation, and that privileges and immunities shall not be granted which shall not on the same terms be granted to all.

Section 30, art. 3, provides "that where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state."   The question was fully discussed in all its phases in the case of State v. Garbroski, 111 Iowa, 496, 56 L. R. A. 570, 82 N. W. 959, 82 Am. St. Rep. 524.   The statute under discussion pro-

vided that peddlers plying their vocation outside of a city or town should pay a license or tax, but that a person who had served in the Civil War need not pay the fee. The statute was held unconstitutional. It is apparent to all that the statute involved in that case is not akin to the statutes now before the court. Judge Ladd in the Garbroski Case reviews many, if not all, the cases upon the subject, and one need not look further for the correct rule, or for the authorities, than his admirable opinion in the Garbroski Case.

All laws of a general nature shall have a uniform operation. These laws in question do have a uniform operation. No one can expect that all laws shall operate upon all people. We have laws with reference to the Legislature, and those laws operate upon that body alone. So as to the office of the Auditor, and a score of other offices, state, county, and municipal. And it is the same as to private affairs. Railroad companies are held liable for an injury to an employé brought about by the negligence of a fellow servant. Such legislation, as all know, is valid. Hundreds of statutes have been enacted in this state known by all to be intended to apply in each case to a single city or town, corporation or trade. That they are valid but few doubt. Statutes were enacted many years ago applying to bridges across the Mississippi river when there was but one bridge, and now there are but few. No one doubts their validity. Years ago statutes were passed authorizing the sale of a railroad to one at the state line, to thereby make a connecting line. But few, if any, ever doubted their validity. Illustrations will readily occur by which I could multiply these cases. And so it is as to granting immunities to some which are denied to others. Exempting farmers, merchants, manufacturers, mining companies, and other corporations from liability in case an employé is injured by another employé's negligence, and holding a railroad liable, well illustrates the whole proposition.

Classifications can be made, providing they are not arbitrarily made. If the Iowa statute provided that a railroad company were liable, in the case above stated, where an employé was injured in building a bridge, cutting timber, or at work in the shops, all the courts would have held the law invalid. But the Legislature provided for a recovery only when the injury occurred in the hazards arising from the use and operation of the road. If these statutes in question are otherwise valid, then it is not an arbitrary classification, because they apply to a business peculiar in itself.

All will agree that there must be rules and regulations applicable to insurance companies not applicable to other corporations. There must be some officer, with the powers of an Insurance Commissioner, to govern and direct and control them. The Iowa Supreme Court has upheld so many statutes in principle like this that the question now being discussed seems very clear to me. The following statutes have been held valid: (1) Innumerable curative and legalizing acts; (2) statutes making railway companies liable for double damages for stock killed; (3) allowing a defendant a continuance, as of course, when in the military service; (4) classifying railroads as to charges for carrying freights and passengers; (5) taxes need not operate upon all persons alike; (6) taxing railroads by one set of officers, and indi-

viduals by another; (7) exempting property from water taxes; (8) taxing foreign insurance companies on their business; (9) exempting certain property from municipal taxes, and compelling others to pay such taxes; (10) taxing transient merchants; (11) assessing stock of state bank differently from that of a national bank; (12) a special law authorizing the building of a particular railroad. No doubt there are others that have been upheld.

Counsel for complainant seem to have forgotten that special legislation in all cases is not prohibited. Special legislation is prohibited as to six enumerated subjects: (1) Assessment and collection of taxes; (2) for laying out highways; (3) for changing the names of persons; (4) for incorporating cities and towns; (5) for vacating roads, streets, and town plats; (6) for locating or changing county seats.

But as no one of the above referred to provisions of the Constitution is applicable to this case, it is necessary to see what other special legislation is prohibited. The Constitution then recites: "In all cases above numerated, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state." It is too apparent to admit of discussion that there are hundreds of subjects upon which the state, through its Legislature, should speak: "Where a general law cannot be made applicable, and where it cannot be of uniform operation throughout the state." And insurance is one of these subjects. In my judgment, the statutes in question are not prohibited by either of the state constitutional provisions.

Chapter 4, tit. 9, of the Iowa Code, which chapter includes the statutes now under consideration, affirmatively makes two among other things appear: (1) That it is the policy of this state to invite solvent and reliable foreign insurance companies to come into this state, particularly for the purpose of giving the people the benefit of competition, and partly for the purpose of obtaining revenue for the state treasury; and both purposes are subserved. (2) That it is the duty of the state auditor to license such companies to do business in the state, if upon investigation he finds them solvent and financially worthy. Such being the policy of the state, and such being the duty of the Auditor, he cannot deny the foreign companies, of the kind as above described, from receiving the proper certificate and from doing an Iowa business. Should he undertake to keep such a company out, the proper court will by mandamus compel him to grant the authority, and admit such company. This being so, he cannot put them out, after they are once lawfully and rightfully in, excepting by virtue of the power lodged with him under a valid and constitutional statute.

What was said by the Chief Justice in the case of R. R. v. State, 31 N. J. Law, 531, 543, although in a tax case, is pertinent:

"It is not denied that the corporate existence of a company is recognized, not by right, but by grace, in foreign jurisdiction, nor that each government has the competence to refuse to recognize such existence, except on its own conditions. The principle is universally acknowledged. Hence laws requiring insurance companies and other foreign corporations to file bonds and submit to other exactions as a prerequisite to their admission in an incorporated capacity into the state. Such laws, when rightfully made, are evidently mere

police regulations, designed to protect the citizens of the state in which they are enacted from loss or imposition, and on this ground their legality cannot be drawn in question. But a tax law, having revenue for its object, is based upon a principle entirely different. The right to tax for revenue is the right of the government to take so much of the property of the person or company on whom the tax falls as such government may deem necessary for its public wants. The act of taking the property, therefore, must, of necessity, be an acknowledgment of the legal status of the person or company whose property is taken. To assert that the company whose property is thus taken has no rights but such as the government taking it chooses to confer is to assert that such company has no title to its property but such as may be conceded to it by the taxing power. It seems to be utterly inconsistent with legal principles which have always been deemed axiomatic to hold that a government can recognize the legal existence of a foreign corporation for the purpose of taxation, and at the same time can deny such legal existence for the purpose of depriving it of those rights which belong to every individual or company known to the law. Such a doctrine would, obviously, offer the entire property of foreign corporations as a prize to the rapacity of any state in whose territories it might be, or over which it might happen to be carried. It is readily to be admitted that a law imposing certain terms upon all foreign corporations as conditions to their acquisition in this state of the right to act in the unity of their corporate existence would be legal. Such law would prevent foreign persons from doing any legal act in this state as a corporation. But can it be maintained that such a law would have the further effect of leaving the property of the company as a spoil of the first taker?"

These companies having the requisite capital, being solvent, having paid their taxes and license fees, and having done all the things required of them by the laws of Iowa and the exactions of the Auditor, having been invited to do business in the state, and being now rightfully here, they for the time being, and until the policy of the state is changed, have the rights, neither more nor less, than the Iowa companies enjoy, and illegal exactions cannot be made upon them. In Insurance Company v. Morse, 20 Wall. 445, 22 L. Ed. 365, the Supreme Court held a statute to be void which required a foreign company to agree not to remove a case to the federal courts. But in Doyle v. Insurance Co., 94 U. S. 535, 24 L. Ed. 148, the Supreme Court recognized the right of a state to oust the company if it did remove its cases to the federal courts. It so held, not because such removals were a good reason for ousting the companies, but because the state had the right to exclude them without reference to the reason.

But that is not the question now being considered. It is not a question of keeping a foreign company out. The question is, shall all companies, foreign and domestic, now rightfully in the state, be compelled to submit to the exactions of an invalid and unconstitutional statute? It is quite certain that an Iowa corporation cannot by any legislation be ousted or dissolved by reason of invoking the federal Constitution. And if the Iowa Legislature should ever be persuaded that the better way to prevent monopolies as between foreign companies is to create a monopoly by giving all the business to Iowa companies it can easily be done. Let there be a legislative declaration to the effect that the local companies may do as they see fit if they stay inside the Constitution, but that foreign companies must quit the state if they hold up the federal Constitution as their shield. It is scarcely possible that such a position will ever be taken. But Wiscon-

sin once did; and, if Iowa ever does, then, and not until then, will the Doyle Case become binding as to Iowa legislation.

The distinct policy of Iowa for many years has been to invite foreign insurance companies into the state. They have been imposed with some burdens not imposed upon home companies, and that this is allowable no one denies. That they can be wholly excluded no one denies. But for the obvious reasons of competition for the benefit of people needing insurance, and for moneys for the state treasury, the state for years has said that they may come and may remain in; and yet the Attorney General now contends that, in the face of such policy, this court, by construction and implication, shall say that such foreign companies shall be punished for seeking the benefits of the federal Constitution.

It must be kept in mind that the statutes in question do not apply alone to foreign companies. Those laws, if valid, apply to all companies. This bill in equity is filed by the complainants for the use and benefit of all companies.

It is not at all necessary in this case to make allegations of diverse citizenship. There are such allegations, but they are unnecessary allegations in this case. ʿHome companies could be joined as plaintiffs in this action. Not only one question, but the principal controversy herein, is a federal question. The court takes jurisdiction because of that question, regardless of citizenship, and will retain jurisdiction over all questions in the case, including questions that are not federal, regardless of the citizenship of the parties. See Opinion of Judge Brewer in Omaha Company v. Cable Company (C. C.) 32 Fed. 727, and cases cited.

But it is argued that there is a remedy at law. A court of equity has the power, and it is likewise its duty, to enjoin the enforcement of an unconstitutional statute when such enforcement would subject the party to innumerable prosecutions, and particularly when such prosecutions would, pending litigation, work great hardships and wrongs and damages.

The recent decision of the Circuit Court of Appeals for this circuit in the case of City of Hutchinson v. Beckham, 118 Fed. 399, 55 C. C. A. 333, is an authority, and of binding force upon this court. It puts at rest the question as to the jurisdictional amount involved. It also .puts at rest the duty and the power of a court of equity to enjoin the enforcement of an invalid law when prosecutions would be followed with loss of business, expense, and hardships. And it also holds the fact that the party could resist the enforcement of such invalid law by a defense to proceedings in the state court does not prevent a court of equity, state or federal, from taking jurisdiction. A state statute can neither enlarge nor curtail the equity jurisdiction of this court. And it will not do to say that because a law is unconstitutional, and because all are conclusively presumed to know the law, there need be no fear that the officer who is commanded to act under the statute will attempt to enforce it. It is the duty of the state Auditor to enforce the statute, if it is a valid statute, and he no doubt feels that it is not incumbent upon him to pass upon its validity, but will recognize it as of force until it is otherwise held by the courts. And it is alleged in

the bill before me that the state Auditor will enforce the statute if not restrained by the process of a court. In the light of such declarations, and the presumptions that he will attempt to enforce the statute, the case of Osborne v. Bank of United States, 9 Wheat. 738, 6 L. Ed. 204, must be regarded as an authority. And the reasons given by Chief Justice Marshall in the opinion in that case as to why Osborne, the state Auditor of Ohio, should not be allowed to enforce a statute of that state, are equally applicable to Mr. Carroll, the Auditor of Iowa, if the statute in question is invalid. In the Doyle Case, 94 U. S. 535, 24 L. Ed. 148, the statute of Wisconsin specifically provided that, if any foreign company should remove a case to the federal court, the state officer should, under an imperative duty, recall and revoke the license of such foreign company to do business in the state.

But in the case at bar foreign and domestic companies are placed on an exact equality. And the statute does not say that, if the foreign companies shall invoke the federal Constitution, such a wrong has thereby been done that the state Auditor can punish it by removing it from the state. But in the case at bar the statute if applicable, and if enforced, will be made to read, in effect, that any insurance company, domestic as well as foreign, shall not dare to look further than the Iowa laws, and that they shall not, at the peril of their existence in this state, dare to claim any right under "the supreme law of the land." This, to me, is not comity between the states, but subordinates the nation to a petty position that it has not occupied for many years.

The statute in question provides that two or more companies shall not do any of the following things: (a) Make or enter into any combination or agreement relating to the rates to be charged for insurance; (b) agree as to the amount of commissions to be allowed agents for procuring the same; (c) agree as to the manner of transacting the fire insurance business in the state.

The first I shall not discuss; but as to the second and third propositions I have no doubt but that the statute is beyond the power of legislation, and will give my reasons: As was held in Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297, and cases cited, insurance is not commerce. Therefore the many cases cited by the Attorney General, arising under the "commerce clause," are not in point. They are irrelevant, and do not have the slightest application. The commerce cases were so decided because all parts of the Constitution applicable must be construed together. And so the Supreme Court has within the last few years in the Addystone Pipe Case, 20 Sup. Ct. 96, and Traffic Association Cases, 19 Sup. Ct. 25, and the Circuit Judges in the Northern Securities Case, 120 Fed. 721, made it plain to every one that, if the question is one of commerce between the states, then the right and liberty of contract must in a measure yield. That is to say, Congress shall have the right to regulate commerce between the states, even though the freedom of contract is curtailed. If this were not so, then the commerce clause would be subordinated to other provisions of the Constitution. The two provisions of the Constitution must be construed together.

There is another class of cases, numerous in number, sound in principle, but which, in my judgment, have no application to the question

now being considered. I refer to cases arising under the police power of the states. Such a case is that of Holden v. Hardy, 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780. The state statute inhibited the employment of a person for more than eight hours a day in underground mines. The Supreme Court held the statute a valid exercise, of the police powers, as protecting the life and health of individuals, and that the same could not be contracted away. No one denies that insurance is a legitimate business, and one that is necessary to the welfare of all people who cannot afford to carry their property without such guaranty against loss. To carry on the business calls for the services of men of affairs and experience. Men must be employed, and that requires contracts. Reinsurance is often required, and that calls for contracts between two or more companies. Adjusters are necessary, and one such person must, or often does, act for several companies. One risk oftentimes must be apportioned between several companies. Companies must charge reasonable rates, and in some states can be compelled to pay the face of the policy. What are reasonable rates, and how are such rates determined? No doubt, partly from the history and statistics of the business, and partly from current experience. One risk is more hazardous than another, and rates must vary. Telephone wiring may or may not increase the risk. Electric lighting, with or without "cut-offs" or "step-downs," may or may not increase the risk. Experiments and experience and statistics may show or differences of opinion may exist. Some risks are greater in the summer and others in the winter. The salary of officers is one item of the costs. The commissions of the solicitors have much to do with it. In short, the business cannot be carried on for a day without making contracts, not alone with the insured, but with other companies, and with persons employed by other companies.

The Attorney General, seeking to avoid the force and weight of the authorities, leaves but little for argument when he concedes in his two briefs as follows:

"It is urged that the act of the Legislature is unconstitutional because it takes from the fire insurance companies doing business within the state the right of contract, which is one of the liberties guarantied by the fourteenth amendment. The conclusive answer to this contention is that the statute does not take away from any insurance company transacting business within the state the right to contract with any person or corporation desiring to enter into any lawful contract with such company, nor does it in any manner abridge the right to make such lawful contract. The sole purpose of the statute, and the end sought to be accomplished by its enactment, is to prevent insurance companies from entering into a contract or combination whereby their rights to enter into lawful contracts with those desiring fire insurance is abridged and restrained. It is conceded at the outset that any act of the Legislature which restricts or abridges the liberty of contract guarantied by section 1 of the fourteenth amendment to the federal constitution is void:"

That the authorities cannot be reconciled is known by all. For instance, statutes quite identical in language, meaning, and purpose were before the courts in Holden v. Hardy, supra, and in Ex parte Morgan (Colo. Sup.) 58 Pac. 1071, 47 L. R. A. 52, 77 Am. St. Rep. 269, and the one decision is squarely against the other. Practically nothing is left to be said on either side, after reading the two opinions. But in those cases the contracts inhibited were by reason of

statutes to protect the health of individuals for whose benefit the laws were enacted.

Then, again, the subject is exhaustively treated by Mr. F. N. Judson in a paper, "Liberty of Contract under the Police Power," before the American Bar Association in 1891. See Reports Am. Bar Ass'n for that year, vol. 14, p. 231.

There are three recent cases which cover the entire question, and which come so near citing all the authorities that one need look but little further for the authorities upon the subject. People v. Orange County Road Const. Co. (N. Y.) 67 N. E. 129; Republic Co. v. State (Ind. Sup.) 66 N. E. 1006; State v. Kreutzberg (Wis.) 90 N. W. 1098. These cases are not cited as involving inhibited contracts, like the ones prohibited by the Iowa statutes, but they are cited as being in principle much the same, and because of the exhaustive discussion of the question. And the fact that the law assailed is what is known as an "Anti-Trust Law" does not take it out from under the federal Constitution. In re Grice (C. C.) 79 Fed. 627; Connolly v. Sewer Pipe, 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679. As against those cases, see State v. Buckeye Pipe Line Co., 61 Ohio St. 520, 56 N. E. 464; Cleland v. Anderson (Neb.) 92 N. W. 306.

But it becomes academic, and mere common place, to undertake to write what this court or that court has said on the question. Law is not an exact science, as is illustrated by the cases arising under the fourteenth amendment, perhaps more than by any of the other debatable legal questions. The "liberty" of the Constitution has been defined, and it will continue to be defined, by some as the right of an individual to keep out of prison, excepting for crime committed. Others will define "liberty" as also including the right to earn a livelihood, acquire property, perform services for another, employ others, make contracts not tainted with an illegal or immoral consideration, and those not injurious to the health or welfare of people. I prefer the latter definition.

Within the meaning of the constitution, as has been held many times by the Supreme Court, "corporation" is a "person." A corporation has the same rights to agree or contract within the scope of its powers as has a person. Can it be possible that legislation like that now presented to the court is valid? If it is valid, then what becomes of the provision, "No man shall be deprived of equal protection of the law," or of that other provision, "No man shall be deprived of life, liberty, or property without due process of law?" Justice Field once said: "The right to pursue them without let or hindrance is a distinguished privilege of the citizens of the United States, and an essential element of that freedom which is their birthright." Another Justice of the United States Supreme Court said: "Yet the power does not and cannot extend to prohibiting a citizen from making contracts, and this is institutional law in England as well as America." Another great Justice has said: "Liberty includes the right to acquire property, and that means and includes the right to make and enforce contracts." And I dare say that there is not an appellate court in this Union but has given a like definition of liberty: "The right to make and enforce contracts."

When the right of contract ceases, the right to do business is at an end. The right to purchase, hold, or sell property must depend upon contract, and without contracts business affairs cannot be carried on for a single day. And the slightest knowledge of insurance will persuade any one that companies, both home and foreign, must have some arrangements and must make some contracts with other companies. Farmers, merchants, laboring men, railway companies, and all other classes of both men and associations must do the same, and both the laws and Constitution permit it. And to single out insurance companies, and say they shall not, is not logical, and, in my judgment, not allowable, under the fourteenth amendment.

Employers of labor agree what they will pay, and laboring men agree for what sum they will work. Buyers and vendors of live stock, grain, groceries, clothing, anything and everything, make their agreements. Farmers will and do agree as to the price for which they will sell, and what they will pay for labor; but this statute says that insurance companies shall agree as to none of these things.

Of course, I do not hold that insurance companies can combine, and thereby enter into a conspiracy to accomplish any desired purpose. But no such question is involved in this case. I am only holding that insurance companies may make the usual contracts that all other persons and corporations may make, which the statute seeks to take from them, and which will be taken from them if the statute in question is upheld. My conclusions are that the statute in question is invalid for the reasons stated, and that the state Auditor cannot enforce its provisions.

The demurrer will be overruled, and the defendant allowed to file a plea or answer, as he may deem best.