HARRIMAN et al. v. NORTHERN SECURITIES CO. et al.

(Circuit Court, D. New Jersey. July 15, 1904.)

1. INJUNCTION—ALLOWANCE.

Where, in a doubtful case, the denial of a preliminary injunction would, on the assumption that the complainant ultimately will prevail, result in greater detriment to him than would, on the contrary assumption, be sustained by the defendant, through its allowance, the injunction usually should be granted.

2. SAME.

The balance of convenience or hardship ordinarily is a factor of controlling importance in cases of substantial doubt existing at the time of granting or refusing the preliminary injunction.

3. SAME.

Such doubt may relate either to the facts or to the law of the case, or to both. It may equally attach to, or widely vary in degree as between, the showing of the complainant and of the defendant, without necessarily being determinative of the propriety of allowing or denying the injunction.

4. SAME—PRESERVATION OF FUND.

Where the sole object for which an injunction is sought is the preservation of a fund in controversy, or the maintenance of the status quo, until the question of right between the parties can be decided on final hearing the injunction properly may be allowed, although there may be serious doubt of the ultimate success of the complainant.

5. SAME.

While the consideration that an appeal does not lie from an interlocutory decree denying a preliminary injunction is entitled to no weight where, on the application, it clearly appears that the complainant cannot prevail on the final hearing, it is often of controlling importance where, on such application, there is room for reasonable doubt as to the ultimate result.

6. SAME—NOVEL QUESTIONS OF LAW.

In accordance with the foregoing principles, held, that a preliminary injunction should issue in a case involving grave, novel and delicate questions of law and a controversy as to material facts bearing upon the equities, regard being had to the comparative hardship or convenience to the respective parties resulting from the awarding or denial of the injunction.

(Syllabus by the Court.)

In Equity.

R. V. Lindabury, Wm. D. Guthrie, and R. S. Lovett, for complainants.

Elihu Root, John G. Johnson, John W. Griggs, Francis L. Stetson, and W. P. Clough, for defendants.

BRADFORD, District Judge. Application has been made on bill, affidavits and exhibits, for a preliminary injunction in a suit brought by Edward H. Harriman, Winslow S. Pierce, the Oregon Short Line Railroad Company and The Equitable Trust Company of New York against the Northern Securities Company and the Northern Pacific Railway Company. The present controversy grows out of a situation created by the final decree of the circuit court of the United States for the district of Minnesota in United States v. Northern Securities Co. et al. (C. C.) 120 Fed. 721, and the affirmatory decree of the Supreme

Court of the United States in the same case. 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679. That was a suit in equity brought by the United States against the Northern Securities Company, the Northern Pacific Railway Company, the Great Northern Railway Company, James J. Hill, William P. Clough, D. Willis James, John S. Kennedy, J. Pierpont Morgan, Robert Bacon, George F. Baker and Daniel S. Lamont. Its object was to enforce the provisions of the act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Anti-Trust Act. Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]. Section 1 declares illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations," and provides that "every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court." Section 2 provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor," punishable in like manner and to the like extent as offences under the first section. Section 3 [U. S. Comp. St. 1901, p. 3201] declares illegal "every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations," and declares that "every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor," punishable in like manner and to the like extent as offences under the preceding sections. Section 4 provides, among other things, that the several circuit courts of the United States shall have "jurisdiction to prevent and restrain violations of this act," and that proceedings under the act "may be by way of petition." The petition or bill of complaint in the Minnesota suit referred to set forth in substance, among other things, that the Northern Pacific Railway Company and the Great Northern Railway Company were common carriers of freight and passengers and, as such carriers, were engaged in trade and commerce among the several states of the United States and with foreign nations; that on and prior to November 13, 1901, the defendants, Hill, Clough, James and Kennedy, and certain other persons whose names were unknown to the complainant, thereinafter referred to as James J. Hill and his associate stockholders, owned or controlled a majority of the capital stock of the Great Northern Railway Company, and the defendants, Morgan, Bacon, Baker and Lamont, and certain other persons whose names were unknown to the complainant, thereinafter referred to as J. Pierpont Morgan and his associate stockholders, owned

or controlled a majority of the capital stock of the Northern Pacific Railway Company; that these two railway companies at and prior to the doing of the acts thereinafter complained of, owned or controlled and operated two separate, independent, parallel and competing lines of railway, running east and west, forming the Northern Pacific system and the Great Northern system, connecting the Great Lakes and the Mississippi River with Puget Sound and the Pacific ocean; that Hill and his associate stockholders, and Morgan and his associate stockholders, acting for themselves as such stockholders and on behalf of the two railway companies respectively in which they owned or held a controlling interest, on and prior to November 13, 1901, entered into an unlawful combination and conspiracy "to effect a virtual consolidation of the Northern Pacific and Great Northern systems, and to place restraint upon all competitive interstate and foreign trade or commerce carried on by them, and to monopolize or attempt to monopolize the same, and to suppress the competition theretofore existing between said railway systems in said interstate and foreign trade or commerce," through the instrumentality of a holding company to be created under the laws of New Jersey and to be called the Northern Securities Company, with a capital stock of $400,000,000, to which, in exchange for its own capital stock upon a certain basis and at a certain rate was to be transferred the capital stock or a controlling interest in the capital stock of each of the two railway companies, with power in the holding corporation to vote such stock and act as the owner thereof, and do whatever it might deem necessary to aid in any manner such railway companies or enhance the value of their stock; that thus the individual stockholders of the two competing railway companies were to be eliminated, and the Northern Securities Company, substituted as a single common stockholder, the interest of such individual stockholders in the property and franchises of the railway companies being converted into an interest in the property and franchises of the holding company; that in pursuance of such unlawful combination or conspiracy, and solely as an instrumentality for effecting the purposes thereof, the Northern Securities Company was, November 13, 1901, created under the laws of New Jersey, with an authorized capital stock of $400,000,000, and on or about the next following day was organized by the election of a board of directors and the selection of a president and other officers; that thereupon Hill and his associate stockholders assigned and transferred to that company a controlling interest in the capital stock of the Great Northern Railway Company, upon an agreed basis of exchange of $180 par value of the capital stock of the Northern Securities Company for each share of the capital stock of the Great Northern Railway Company, and Morgan and his associate stockholders assigned and transferred to the Northern Securities Company a majority of the capital stock of the Northern Pacific Railway Company upon an agreed basis of exchange of $115 par value of the capital stock of the Northern Securities Company for each share of the capital stock of the Northern Pacific Railway Company; that in further pursuance of such unlawful combination or conspiracy the Northern Securities Company offered to the stockholders of the two railway companies to issue and exchange its capital stock for the capital stock of those companies

upon the above mentioned basis of exchange, no other consideration being required; that in further pursuance of such unlawful combination or conspiracy the Northern Securities Company had acquired an additional amount of the stock of the two railway companies, issuing therefor its own stock upon the same basis of exchange, and was then holding as owner substantially all of the capital stock of the Northern Pacific Railway Company and a majority of or controlling interest in the capital stock of the Great Northern Railway Company, and was voting the same, collecting the dividends thereon, and in all respects acting as owner thereof in the organization, management and operation of such railway companies, and in receipt and control of their earnings; that thus a virtual consolidation under one ownership and source of control of the Great Northern and Northern Pacific railway systems had been effected, a combination or conspiracy in restraint of the trade or commerce among the several states and with foreign nations, formerly carried on by the two railway companies independently and in free competition one with the other, had been formed and was in operation, and the defendants were thereby attempting to monopolize, and had monopolized, such interstate and foreign trade and commerce, in violation of the act of Congress of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], above referred to; that no consideration whatever had existed, or would exist, for the above mentioned transfer of the stock of the railway companies by their stockholders to the Northern Securities Company other than the issue of the stock of the latter company to them in exchange therefor, for the purpose, in the manner, and upon the basis above stated; that the Northern Securities Company was not organized in good faith to purchase and pay for the stock of the two railway companies, but solely to incorporate the pooling of the stock of said companies and to carry into effect such unlawful combination or conspiracy; that the Northern Securities Company was a mere depositary, custodian, holder and trustee of the stock of the railway companies, and its shares of stock were but beneficial certificates issued against such railway stock to designate the interest of the holders in the pool; and that its subscribed capital was but $30,000, and its authorized capital stock of $400,000,000 was just sufficient, when all issued, to cover the exchange value of substantially the entire stock of the two railway companies, upon the basis and at the rate agreed upon, such exchange value being about $122,000,000 in excess of the combined capital stock of such railway companies taken at par. Answers and replications were duly filed, evidence was taken and such proceedings were thereafter had in the case that a decree was entered in the circuit court April 9, 1903, pursuant to the prayers of the petition or bill, but not including all the relief therein asked. In that decree it was declared that the defendants, in violation of the Anti-Trust Act, had entered into a combination or conspiracy in restraint of trade and commerce among the several states, and that all of the stock of the Northern Pacific Railway Company and of the Great Northern Railway Company "now claimed to be owned and held by the defendant, The Northern Securities Company, was acquired and is now held by it in virtue of such combination or conspiracy in restraint of trade and commerce among the several States."

and a perpetual injunction was granted restraining the Northern Securities Company from "acquiring or attempting to acquire further stock of either of the aforesaid railway companies," or "voting the aforesaid stock which it now holds or may acquire," or "attempting to vote it, at any meeting of the stockholders of either of the aforesaid railway companies," or "exercising or attempting to exercise any control, direction, supervision or influence whatsoever over the acts and doings of said railway companies or either of them by virtue of its holding such stock therein;" and restraining the Northern Pacific Railway Company and the Great Northern Railway Company respectively and collectively from "permitting the stock aforesaid to be voted by the Northern Securities Company, or in its behalf, by its attorneys or agents at any corporate election for directors or officers of either of the aforesaid railway companies," or "paying any dividends to the Northern Securities Company on account of stock in either of the aforesaid railway companies which it now claims to own and hold," or "permitting or suffering the Northern Securities Company or any of its officers or agents, as such officers or agents, to exercise any control whatsoever over the corporate acts of either of the aforesaid railway companies." Immediately after the injunctive portion of the decree is the following clause:

"But nothing herein contained shall be construed as prohibiting the Northern Securities Company from returning and transferring to the Northern Pacific Railway Company and the Great Northern Railway Company, respectively, any and all shares of stock in either of said railway companies which said, the Northern Securities Company, may have heretofore received from such stockholders in exchange for its own stock; and nothing herein contained shall be construed as prohibiting the Northern Securities Company from making such transfer and assignments of the stock aforesaid to such person or persons as may now be the holders and owners of its own stock originally issued in exchange or in payment for the stock claimed to have been acquired by it in the aforesaid railway companies."

It may not be without significance, although it is unnecessary now to discuss the point, that the relief prayed in the petition or bill of the United States was in some particulars broader than that granted in the final decree. This decree was in all respects affirmed by the Supreme Court of the United States March 14, 1904, "with liberty to the Circuit Court to proceed in the execution of its decree as the circumstances may require." Mr. Justice Harlan in his opinion affirmatory of the decree of the court below, among other things, said:

"No valid objection can be made to the decree below, in form or in substance. * * * The Circuit Court has done only what the actual situation demanded. Its decree has done nothing more than to meet the requirements of the statute. It could not have done less without declaring its impotency in dealing with those who have violated the law. The decree, if executed, will destroy, not the property interests of the original stockholders of the constituent companies, but the power of the holding corporation as the instrument of an illegal combination of which it was the master spirit, to do that which, if done, would restrain interstate and international commerce. The exercise of that power being restrained, the object of Congress will be accomplished; left undisturbed, the act in question will be valueless for any practical purpose."

No opinion is now expressed or intimated as to the force or effect of the above utterance.

Thereafter the board of directors of the Northern Securities Company adopted March 22, 1904, certain preambles and resolutions, reciting that the company "has acquired and now holds 1,537,594 shares in the capital stock of the Northern Pacific Railway Company; and 1,181,-242 shares in the capital stock of the Great Northern Railway Company," and "has been enjoined from voting upon the shares of either of the said railway companies, and each of the said railway companies has been enjoined from paying to this company any dividends upon any of the shares of such railway company held by this company," and that "there are now outstanding 3,954,000 shares of its own capital stock," and that it "desires and intends to comply with the decree in the said suit, fully and unreservedly, and without delay," and declaring it "necessary and desirable for this company so to reduce its present capital stock as will enable it, without delay, in connection with such reduction, to distribute among its shareholders, the shares of capital stock of said railroad companies held by it," and advisable that the fourth article of its certificate of incorporation should be so amended as to read as follows:

"Fourth. The capital stock of this company is hereby reduced to three million nine hundred fifty-four thousand dollars ($3,954,000), and shall hereafter be three million nine hundred and fifty-four dollars ($3,954,000), divided into thirty-nine thousand five hundred and forty (39,540) shares of one hundred dollars ($100) each. Such reduction of capital stock shall be accomplished by each holder of outstanding shares of this company's stock surrendering to the company, for retirement, ninety-nine per centum of the shares held by him. Upon the surrender to this company, by any shareholder, of the entire number of shares, and parts of shares, of this company's stock, which he is hereby required to surrender, this company will assign to him, for each share so surrendered, thirty-nine dollars and twenty-seven cents ($39.27) of the stock of the Northern Pacific Railway Company, and thirty dollars and seventeen cents ($30.17) of the preferred stock of the Great Northern Railway Company, and proportional amounts thereof for fractional shares of the stock of this company."

The resolutions also called for a meeting of the stockholders of the Northern Securities Company, to be held April 21, 1904, for the purpose of taking action upon the proposed alteration of its certificate of incorporation.

The bill in the present suit sets forth in substance, among other things, that the total authorized capital stock of the Northern Pacific Railway Company in November, 1901, amounted to $155,000,000 par value, consisting of $75,000,000 par value of preferred stock and $80,000,000 par value of common stock; that such proceedings were had in November and December, 1901, that such preferred stock was converted into common stock, so as to make the entire issue of stock of the Northern Pacific Railway Company consist of common stock to the amount of $155,-000,000 par value, and such is the authorized amount of its capital stock issued and now outstanding; that the authorized capital stock of the Great Northern Railway Company in November, 1901, was and still is about $125,000,000 par value, of which about $123,000,000 par value has been issued and was then and is now outstanding; that the Northern Pacific and Great Northern railway systems are substantially parallel and in a position to compete with each other in the transaction of interstate and foreign commerce carried on by them; that the North-

ern Securities Company, although incorporated and organized in form according to and nominally for objects authorized by the laws of New Jersey, in reality was incorporated and organized in pursuance of a combination in restraint of trade and commerce among the several states and for objects prohibited by the Anti-Trust Act; that prior to November 13, 1901, Hill, Morgan, Clough, James, Kennedy, Bacon, Baker and Lamont, and their associates, owning or controlling a majority of the capital stock of the Great Northern Railway Company and a majority of the common capital stock of the Northern Pacific Railway Company, agreed to organize a holding company under the laws of New Jersey, and that such holding company should acquire and permanently hold a majority of the shares of the capital stock of those railway companies respectively and control the operation and management thereof in perpetuity, and that the then existing holders of such railway shares should deposit the same with such holding company and receive in lieu thereof share certificates of the holding company upon the basis of $180 par value of its stock for each share of the Great Northern Railway stock, and $115 par value of its stock for each share of the Northern Pacific Railway stock, and that the holding company should act as custodian, depositary or trustee of such railway shares on behalf of the existing shareholders of the two railway companies and their associates; that thereupon in pursuance of such agreement the Northern Securities Company was created and organized under the laws of New Jersey, for the object of acquiring and holding shares of the capital stock of other corporations, and with an authorized capital stock of $400,000,000, divided into four million shares of the par value of $100 each, and forthwith agreed to acquire and hold the shares of stock of the two railway companies as custodian, depositary or trustee, and to issue in exchange therefor its own share certificates upon the above mentioned basis; that prior to April 9, 1903, about $176,822,900 par value of the stock of the Northern Securities Company was issued in exchange for about $153,759,400 par value of the stock of the Northern Pacific Railway Company, and about $211,057,600 par value of the stock of the former company was issued in exchange for about $118,124,200 par value of the stock of the Great Northern Railway Company, and about $7,522,000 par value of the stock of the Northern Securities Company was issued for cash used for the purchase of other property and for corporate purposes; that the Northern Securities Company caused the certificates for such railway shares to be transferred to and registered in its own name or the names of its agents and ever since has held and now holds the same so registered; that such issue of capital stock of the Northern Securities Company for the stock of the two railway companies was to the then existing holders of stock in such railway companies in exchange for certificates for such railway stock and for the purpose of effectuating the above mentioned scheme or combination whereby the Northern Securities Company, holding a majority of the shares of stock of the two railway companies, would be enabled to control the operation and management of the same; that all the persons to whom stock of the Northern Securities Company was issued for shares of either of the railway companies or for cash had full knowledge of the purposes for which it was organized, and of the fact that a

majority of the capital stock of each of the railway companies had been or was to be deposited with it as custodian or depositary in pursuance of the above mentioned agreement; that prior to the time of the incorporation and organization of the Northern Securities Company, the Oregon Short Line Railroad Company had acquired and at that time owned $37,023,000 par value of the common stock, and $41,085,000 par value of the preferred stock of the Northern Pacific Railway Company, represented by certificates issued to and registered in the names of the complainants Harriman and Pierce; that after the incorporation of the Northern Securities Company had been resolved upon Harriman, Pierce and the Oregon Short Line Railroad Company agreed with the promoters and incorporators of the former company to transfer to and deposit with it under the terms and conditions before stated, the shares of the Northern Pacific Railway Company of the aggregate par value of $78,108,000 owned by the Oregon Short Line Railroad Company, and to receive in exchange therefor certificates of the Northern Securities Company representing an interest therein of $82,491,871 par value, and $8,915,629 in cash, and in pursuance of such agreement Harriman and Pierce, acting for the Oregon Short Line Railroad Company, did, on or about November 18, 1901, transfer and deliver to the Northern Securities Company certificates for $37,023,000 par value of the common stock and $41,085,000 par value of the preferred stock of the Northern Pacific Railway company, owned by the Oregon Short Line Railroad Company, and received in exchange therefor certificates of the Northern Securities Company representing an interest of $82,491,-871 par value, and the above mentioned sum of $8,915,629 in cash; that Harriman and Pierce are now, and ever since November 18, 1901, have been, the registered owners and holders of the $82,491,871 par value of the shares of the Northern Securities Company, and such holding of stock is and at all times has been by them as trustees for the use and benefit of the Oregon Short Line Railroad Company, which is the beneficial owner thereof; that the $82,491,871 par value of the stock of the Northern Securities Company so standing in the names of Harriman and Pierce, was part of the original issue of stock by that company; that the above mentioned exchange was made by Harriman and Pierce and the Oregon Short Line Railroad Company in good faith and in the belief that the organization of the Northern Securities Company was not, and the acquisition and holding by it of the stock of the two railways as stated would not be, in violation of any statute of the United States, and it was owing to such belief that the complainants did not, pending the final determination of the suit brought by the United States in Minnesota, take any steps or institute any proceedings for the protection of their rights in the premises; that the Oregon Short Line Railroad Company by indenture dated July 17, 1902, duly pledged $82,491,000 par value of the stock of the Northern Securities Company with The Equitable Trust Company of New York, as trustee, for an issue of bonds of that railroad company, of which bonds $82,491,000 face value have been certified and issued and are now outstanding; that the stock of the Northern Securities Company, so issued to Harriman and Pierce November 18, 1901, is still registered in their names and the certificates therefor duly endorsed are now in the actual cus-

tody of The Equitable Trust Company of New York as pledgee, and are available for tender, return or restoration to the Northern Securities Company; that at the time of such exchange, on or about November 18, 1901, it was agreed between Harriman and Pierce and the Northern Securities Company that the $41,085,000 par value of the preferred stock of the Northern Pacific Railway Company should be converted into common stock of that railway company, and such preferred stock was subsequently, in or about December, 1901, converted by the Northern Securities Company into such common stock of the same par value; that certificates for $34,709,062 par value of such common stock registered in the name of the Northern Securities Company on the books of the railway company were substituted in lieu of the certificates for such preferred stock; that the Northern Securities Company caused such original common stock to be transferred to it upon the books of the railway company, and now holds within the jurisdiction of this court certificates registered in its name on the books of the railway company, namely, the Northern Pacific Railway Company, for such common stock so originally received from Harriman and Pierce, and for the common stock into which such preferred stock was so converted and certificates substituted as above mentioned. The bill then sets forth in substance the proceedings in United States v. Northern Securities Company et al. (C. C.) 120 Fed. 721, and the final decree therein of the circuit court and the decree of the Supreme Court of the United States on appeal. The bill further alleges in substance that the complainants were represented in that suit by the Northern Securities Company and the Northern Pacific Railway Company as well as by the individual defendants, Morgan, Bacon, Baker and Lamont, who were named as the representatives of original holders and owners of the stock of the Northern Pacific Railway Company acquired and held by the Northern Securities Company; that the effect of the decree of the circuit court as affirmed by the Supreme Court of the United States was to adjudge that the Northern Securities Company was not a purchaser or owner, but simply a custodian, of the shares of stock of the two railway companies acquired and held by it; that it acquired and held possession thereof in violation of the Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]; that it acquired no title thereto and cannot transfer any rights in respect thereof; that the legal and equitable owners thereof were and are the several parties who originally exchanged the same for stock of the Northern Securities Company, or their assigns; that immediately upon the rendition of the decision of the Supreme Court of the United States the Northern Securities Company, through its board of directors, determined fully and unreservedly to abandon and terminate the above mentioned combination and its holding of such railway stock, and to that end to reduce the capital stock of the company by ninety-nine per cent thereof, or to $3,954,000 par value, and to distribute and divide the stock of the two railway companies held by it, pro rata among its own stockholders, but not to return and retransfer to the stockholders of those railway companies, respectively, or their assigns, any of the shares of stock in either of them which it, the Northern Securities Company, originally received from such stockholders in exchange for its own stock; that in order to consummate such purposes

the board of directors of the Northern Securities Company on or about March 22, 1904, adopted the preambles and resolutions hereinbefore referred to; that thereupon a circular or notice was issued by and on behalf of that company to its stockholders, notifying them of a special meeting for the purpose of voting upon the proposition submitted by the directors in the resolutions adopted; that such meeting of stockholders was held April 21, 1904, and at it the stock of the Northern Securities Company was reduced ninety-nine per cent by a vote of more than seventy-five per cent. in interest of its stockholders, and by a like vote the proposed plan of pro rata distribution was assented to, but the complainants then and there duly protested that such plan of distribution was illegal and in violation of their rights; that such plan is unauthorized by law, illegal and ultra vires the Northern Securities Company, in violation of the rights and equities of the complainants, and of the laws of the United States and of New Jersey: that such plan has never been assented to by the complainants and is not binding upon them; that the books and records of the Northern Securities Company show for what purpose or consideration each outstanding certificate of stock was originally issued. whether for cash or for stock of the Northern Pacific Railway Company or of the Great Northern Railway Company, and will disclose that a large part of the stock of the Northern Securities Company, issued originally in exchange for stock of those railway companies, is now held in the name or on behalf of original holders who exchanged the same for stock of the railway companies, and, wherever there have been transfers of certificates to third parties, the origin of each and every outstanding certificate of stock of the Northern Securities Company so transferred to third parties can be so traced and shown in and by such books and records that the assignees of the original holders can be identified and the stock of either railway company originally exchanged by the assignors can be delivered to such assignees in exchange for their present holdings of stock of the Northern Securities Company; that the Northern Securities Company threatens and intends immediately to distribute the shares of stock of each of the two railway companies pro rata among its, the Northern Securities Company's, stockholders in disregard of the rights of the complainants, and unless enjoined by this court from so doing, will forthwith make such distribution, whereby stock of the Northern Pacific Railway Company belonging to the complainants, and to which they are entitled will be lost by them, and they will thereby suffer injury which cannot be compensated in damages, in that the shares of stock of that railway company to which they are so entitled are registered on the books of the railway company in the name of the Northern Securities Company, and those railway company shares or any like amount of such shares cannot be purchased in any market or from any persons; that the proposed distribution pro rata in lieu of the return and restitution of the stock of the railway companies would involve a loss of annual income to the complainants amounting to over $1,000,000, the dividends at the rate now paid upon the stock of the Northern Pacific Railway Company to which they are en-

titled exceeding by more than $1,000,000 per annum the dividends upon the stock of the Great Northern Railway Company and Northern Pacific Railway Company which they would receive upon such pro rata distribution; that the value of the stock of the Northern Pacific Railway Company to which the complainants are entitled now exceeds and at all times mentioned in the bill exceeded by more than $10,000,000 the aggregate value of the pro rata share of the stock of the two railway companies which they would receive upon such pro rata distribution, which would be $32,070,612 par value of stock of the Northern Pacific Railway Company and $24,638,919 par value of stock of the Great Northern Railway Company, instead of $78,108,000 par value of stock of the former company; that the complainants are ready, able and willing, and offer, to return and deliver, or cause to be returned and delivered, and they tender, to the Northern Securities Company all the certificates for the shares of its capital stock so received by them, and such part of the above mentioned sum of $8,915,629 in cash, paid to them by or on behalf of that company, as may be just, or such further or other sum as the court shall fix, in exchange for and upon the return of the common stock of the Northern Pacific Railway Company, delivered and exchanged by them as above·stated, and the common stock of such railway company into which the preferred stock so exchanged was converted, and they offer to bring into court such stock of the Northern Securities Company and such moneys whenever the court shall direct, and in all respects to do equity and right in the premises; and that, after the return and restoration to the original depositors or their assigns of all the shares of stock of the railway companies, acquired and held by the Northern Securities Company, as above stated, there will remain in the treasury of that company assets and funds sufficient to pay and redeem all of the $7,522,000 par value of its stock issued for cash, or to fully compensate any holders thereof if compensation be adjudged. The complainants pray that it may be decreed that the proposed plan of distribution is illegal and in violation of their rights and equities, and that they are entitled to the return and transfer to them by the Northern Securities Company of the shares of common stock of the Northern Pacific Railway Company, which were so delivered by Harriman and Pierce, and the shares of common stock into which the preferred stock of that railway company delivered by them were converted, in exchange for the certificates of stock of the Northern Securities Company so issued to and now held by the complainants, and such sum in cash as may be just; that the Northern Securities Company may be ordered and directed to endorse the certificates now held by it for such stock of the Northern Pacific Railway Company to the Oregon Short Line Railroad Company, or in blank, and deliver the same to The Equitable Trust Company of New York in exchange for the stock of the Northern Securities Company now held by such trust company, to be subject to its rights and lien as trustee; that the Northern Securities Company be perpetually enjoined and restrained from parting with, disposing of, transferring, assigning or distributing any part of the stock of

the Northern Pacific Railway Company received from Harriman and Pierce, or any common stock into which the preferred stock received from them may have been converted, or the certificates now representing the same or any part thereof, except to return the same to the complainants in exchange for its own stock issued as above stated and the cash now tendered by them; that the complainants have such other or further relief as shall be proper under the circumstances; and that the Northern Securities Company may be enjoined and restrained from parting with, disposing of, transferring, assigning or distributing the stock of the Northern Pacific Railway Company in question, or any part thereof, or any certificates now representing the same during the pendency of this suit.

The defense controverts material allegations in the bill, some of which embody averments of fact, and others averments of law. With respect to some of the alleged facts, important in their bearing upon the equities of the case, the affidavits and exhibits are conflicting on substantial points. On the face of the bill it is evident that the final decision necessarily will involve the consideration of grave, novel and delicate questions of law. On the presentation of their arguments for and against the awarding of a preliminary injunction counsel on both sides have with strong insistence urged, and with elaboration and signal ability discussed, a number of legal propositions, important and far-reaching in their scope, and by no means free from doubt. Whether or not a final decision will require a determination of all these propositions, the fact remains that the eminent counsel advancing them have during a hearing of nearly three days pressed them with zeal and in manifest reliance upon their soundness and materiality. The briefs of argument and authorities, containing nearly 800 printed pages, and principally devoted to the discussion of the principles of law and equity deemed applicable to the case, fairly may be accepted as evidence that much may seriously be said on each side about the law, if not the facts, involved. The case not being ripe for a final decision, the present application is for a preliminary injunction. The granting or refusal of a preliminary injunction, whether mandatory or preventive, calls for the exercise of a sound judicial discretion in view of all the circumstances of the particular case. Regard should be had to the nature of the controversy, the object for which the injunction is sought, and the comparative hardship or convenience to the respective parties involved in the awarding or denial of the injunction. The legitimate object of a preliminary injunction, preventive in its nature, is the preservation of the property or rights in controversy until the decision of the case on a full and final hearing upon the merits, or the dismissal of the bill for want of jurisdiction or other sufficient cause. The injunction is merely provisional. It does not, in a legal sense, finally conclude the rights of parties, whatever may be its practical operation under exceptional circumstances. In a doubtful case, where the granting of the injunction would, on the assumption that the defendant ultimately will prevail, cause greater detriment to him than would, on the contrary assumption, be suffered by the complainant, through its refusal,

the injunction usually should be denied. . But where, in a doubtful case, the denial of the injunction would, on the assumption that the complainant ultimately will prevail, result in greater detriment to him than would, on the contrary assumption, be sustained by the defendant through its allowance, the injunction usually should be granted. The balance of convenience or hardship ordinarily is a factor of controlling importance in cases of substantial doubt existing at the time of granting or refusing the preliminary injunction. Such doubt may relate either to the facts or to the law of the case, or to both. It may equally attach to, or widely vary in degree as between, the showing of the complainant and that of the defendant, without necessarily being determinative of the propriety of allowing or denying the injunction. Where, for instance, the effect of the injunction would be disastrous to an established and legitimate business through its destruction or interruption in whole or in part, strong and convincing proof of right on the part of the complainant and of the urgency of his case.is necessary to justify an exercise of the injunctive power. Where, however, the sole object for which an injunction is sought, is the preservation of a fund in controversy, or the maintenance of the status quo, until the question of right between the parties can be decided on final hearing, the injunction properly may be allowed, although there may be serious doubt of the ultimate success of the complainant. Its allowance in the latter case is a provisional measure, of suspensive effect and in aid of such relief, if any, as may finally be decreed to the complainant. These views are supported by abundant authority to which, were it not for the importance of the case, I should refrain from adverting. In Russell v. Farley, 105 U. S. 433, 438, 26 L. Ed. 1060, the court through Mr. Justice Bradley said:

"It is a settled rule of the Court of Chancery, in acting on applications for injunctions, to regard the comparative injury which would be sustained by the defendant, if an injunction were granted, and by the complainant, if it were refused. Kerr on Injunctions, 209, 210. And if the legal right is doubtful, either in point of law or of fact, the court is always reluctant to take a course which may result in material injury to either party."

In City of Newton v. Levis, 79 Fed. 715, 25 C. C. A. 161, the circuit court of appeals for the eighth circuit through Judge Sanborn said:

"The granting or withholding of a preliminary injunction rests in the sound judicial discretion of the court, and the only question presented by this appeal is whether or not the court below erred in the exercise of that discretion, under the established legal principles which should have guided it. The propriety of its action must be considered from the standpoint of that court. * * * The controlling reason for the existence of the right to issue a preliminary injunction is that the court may thereby prevent such a change of the conditions and relations of persons and property during the litigation as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated. When the questions to be ultimately decided are serious and doubtful, the legal discretion of the judge in granting the writ should be influenced largely by the consideration that the injury to the moving party will be certain, great and irreparable if the motion is denied, while the inconvenience and loss to the opposing party will be inconsiderable, and may well be indemnified by a proper bond if the injunction is granted. A preliminary injunction maintaining the status quo may properly issue when-

ever the questions of law or fact to be ultimately determined in a suit are grave and difficult, and injury to the moving party will be immediate, certain, and great if it is denied, while the loss or inconvenience to the opposing party will be comparatively small and insignificant if it is granted. * * * The arguments and brief of counsel invite us to a consideration of the questions of law which must be finally determined upon a demurrer to the bill, or upon a final hearing of this case after answer. We have, however, found it unnecessary to decide these questions on this appeal, and we express no opinion upon them. They are of sufficient importance and difficulty to demand careful examination and deliberate consideration," etc.

In Glascott v. Lang, 3 Myl. & C. 451, 455, Lord Chancellor Cottenham said:

"In looking through the pleadings and the evidence, for the purpose of an injunction, it is not necessary that the court should find a case which would entitle the plaintiff to relief at all events. It is quite sufficient if the court finds, upon the pleadings, and upon the evidence, a case which makes the transaction a proper subject of investigation in a court of equity."

In Hadden v. Dooley, 74 Fed. 429, 431, 20 C. C. A. 494, the circuit court of appeals for the second circuit through Judge Shipman said:

"When the questions which naturally arise upon the transactions make them a proper subject for deliberate examination, if a stay of proceedings will not result in too great injury to the defendants, it is proper 'to preserve the existing state of things until the rights of the parties can be fairly and fully investigated and determined' by evidence and proofs which have the merit of accuracy."

In Great Western R. Co. v. Birmingham, etc., R. Co., 2 Phil. Ch. 597, Lord Chancellor Cottenham said:

"It is certain that the court will in many cases interfere and preserve property in statu quo during the pendency of a suit, in which the rights to it are to be decided, and that without expressing, and often without having the means of forming, any opinion as to such rights. It is true that no purchaser pendente lite would gain a title; but it would embarrass the original purchaser in his suit against the vendor which the court prevents by its injunction. * * * It is true that the court will not so interfere, if it thinks that there is no real question between the parties; but seeing that there is a substantial question to be decided, it will preserve the property until such question can be regularly disposed of. In order to support an injunction for such purpose, it is not necessary for the court to decide upon the merits in favor of the plaintiff. If, then, this bill states a substantial question between the parties, the title to the injunction may be good, although the title to the relief prayed may ultimately fail. Is, then, the case stated by the bill so clear in favor of the defendants, and so inadequate to support the relief prayed by the bill, as to justify the court in permitting it to be disposed of, and new titles or interests to be introduced, before any decision can be obtained upon the case so made?".

In Shrewsbury & Chester R. Co. v. Shrewsbury R. Co., 1 Sim. N. S. *410, *426, *427, *432, the Vice-Chancellor, Lord Cranworth, said:

"When the court is called on to interfere to preserve property pendente lite, there are, I apprehend, two points on which the court must satisfy itself. First, it must satisfy itself, not that the plaintiff has, certainly, a right, but that he has a fair question to raise as to the existence of such a right. * * * Where it is made out that there is a point to be decided which the plaintiff is fairly raising, still there is a further question, namely, whether interim interference, on a balance of convenience and inconvenience to the one party and to the other, is or is not expedient. Where the alternative is interference or

probable destruction of the property, there, of course, the court will be very ready to lend its immediate assistance, even at considerable risk that it may be encroaching on what may eventually turn out to be a legal right of the defendant. But where, on the other hand, the only evil to result from non-interference is, that the plaintiff may, by the contracts or deeds of the defendant, be retarded or embarrassed in his litigation, there the court will be far more ready to listen to any suggestion of the defendant showing that interference during litigation will prejudice his rights. * * * Although I am perfectly satisfied of the authority of this court to issue an injunction, not merely to restrain parties from doing acts, but also from entering into contracts pending litigation that may embarrass the plaintiff in his suit, and that the court is entitled to do so whenever it sees there is a fair ground for litigation raised by the plaintiff, yet that right of the court must be guided by a discretion not to exercise it where it sees that on the balance of convenience and inconvenience between interim interference and non-interim interference the balance greatly preponderates in favor of the defendant and against the plaintiff."

In the above case a preliminary injunction was refused on the ground of the "enormous preponderance of inconvenience in granting the injunction over any possible inconvenience in refusing it." The doctrine of the foregoing cases is contained in many others from which there is no occasion to quote. Denver & R. G. R. Co. v. United States, 124 Fed. 156, 59 C. C. A. 579; Allison v. Corson, 88 Fed. 581, 32 C. C. A. 12; Buskirk v. King, 72 Fed. 22, 18 C. C. A. 418; Sanitary Reduction Works v. California Reduction Co. (C. C.) 94 Fed. 693; Southern Pac. Co. v. Earl, 82 Fed. 690, 27 C. C. A. 185; New Memphis Gas & Light Co. v. Memphis (C. C.) 72 Fed. 952; Indianapolis Gas Co. v. Indianapolis (C. C.) 82 Fed. 245; Georgia v. Brailsford, 2 Dall. 402, 1 L. Ed. 433.

It does not appear, nor has it been claimed or intimated, that the granting of the preliminary injunction asked for would interfere with the operation of the Northern Pacific Railway Company and the Great Northern Railway Company, or either of them, or otherwise prove detrimental to the interests of the public. It undoubtedly would, during the continuance in force of the injunction, preclude the stockholders of the Northern Securities Company, or a considerable proportion of them, from directly or indirectly receiving dividends on the stock of either of the railway companies, unless under and by virtue of some voluntary and extrajudicial arrangement. But this court has power to require of the complainants as a condition precedent to the issuing of the injunction, a bond in such form and amount as fully to indemnify all persons, who may ultimately be found entitled to such dividends against all loss or damage resulting from the suspension of their payment. On the other hand, the denial of a preliminary injunction would, if the complainants should ultimately prevail, render barren their victory so far as relief in this suit is concerned. The stock of the two railway companies would be distributed pro rata among the stockholders of the Northern Securities Company in accordance with the plan of distribution adopted by the latter company. The complainants would receive, instead of stock of the Northern Pacific Railway Company of the par value of $71,732,062 claimed by them, stock of that company amounting at par to only $32,070,612, and stock of the Great Northern Railway Company of the par value of

$24,638,919. The difference in the par value between the stock of the Northern Pacific Railway Company claimed by the complainants and the stock of that company which they would receive under the proposed plan is $39,661,450. If the complainants be sustained in their contention here made as to their ownership and right to recover stock, such right would not extend to stock of the Great Northern Railway Company, but only to stock of the Northern Pacific Railway Company. A pro rata distribution under the proposed plan of the $39,661,450 par value of stock of the latter company, included in the amount now sued for, among the stockholders of the Northern Securities Company, other than the complainants, would not only debar the latter from any relief to which they may be entitled under their present bill, but to a moral certainty entail upon them a burdensome multiplicity of suits attended with great labor and expense. It would also obviously be calculated to hinder, embarrass and probably or possibly defeat them in their effort to recover large quantities of such stock from persons purchasing the same in good faith and for full consideration, directly or indirectly, from the stockholders of the Northern Securities Company participating in such pro rata distribution, through the creation of new equities on the part of such purchasers. In view of the character of the questions involved in this case it would be highly inequitable that the complainants should, in advance of any final decision on the merits, be put in such a position as to be precluded, either wholly or in large measure, from the realization and enjoyment of the fruits which should be theirs through the immediate result of a final decree in the present case, should it ultimately be determined in their favor.

It appears from the bill, affidavits and exhibits, that, aside from any question of right between the parties to one kind of stock in contradistinction to another, the real value in dispute is of great magnitude. For $37,023,000 par value of common stock and $41,085,000 par value of preferred stock of the Northern Pacific Railway Company turned over by Harriman and Pierce to the Northern Securities Company November 18, 1901, the latter company issued to them $82,491,871 par value of its stock and also paid them $8,915,629 in cash. All of the common and preferred stock so turned over by Harriman and Pierce, aggregating $78,108,000 par value was taken by the Northern Securities Company at an agreed real valuation of $115 for each $100 at par without distinction between common and preferred stock. The plan of pro rata distribution of the Northern Securities Company contemplates the transfer and assignment to all stockholders of that company of both preferred stock of the Great Northern Railway Company and common stock of the Northern Pacific Railway Company, in such manner that each and every holder of stock of the Northern Securities Company will, on the basis of the surrender to it for cancellation of 99 per cent. of such stock, receive for each $100 par value of such surrendered stock $30.17 par value of the preferred stock of the Great Northern Railway Company and $39.27 par value of the common stock of the Northern Pacific Railway Company. Under the proposed plan

the holders of the remaining one hundredth of the stock of the Northern Securities Company would also be entitled to share in the residue of property in the treasury of that company remaining after the reduction of its stock by 99 per cent. The complainants hold $82,491,871 par value of the stock of the Northern Securities Company, and, as before stated, would receive $24,638,919 par value of the preferred stock of the Great Northern Railway Company and $32,070,612 par value of the common stock of the Northern Pacific Railway Company. The present real or market value of the preferred stock of the former company is about, and is admitted to be, $170 for each $100 par value, while that of the common stock of the Northern Pacific Railway Company is $135 for each $100 par value. Under the proposed plan the real value which the complainants would receive in stock of the Great Northern Railway Company would be $41,886,162, and the real value which they would receive in stock of the Northern Pacific Railway Company would be $41,295,326, making a total of $83,181,488, aside from any interest they might have in any undisposed of residue of property remaining in the treasury of the Northern Securities Company. Reference will later be made to such undisposed of residue. It appears from the affidavits and exhibits that in November, 1901, the Northern Pacific Railway Company adopted a plan for the conversion of all its preferred stock into common stock; the preferred stock then amounting to $75,000,000 par value, and the common stock to $80,-000,000 par value. Under this plan the Northern Securities Company, as the holder of $37,023,000 par value of the common stock became entitled to surrender preferred stock of the Northern Pacific Railway Company and receive therefor seventy five eightieths of its par value in the new common stock. There is evidence furnished by the affidavits and exhibits that the Northern Securities Company exercised this right and received of such new common stock $34,709,062 at par. If such be the fact, the latter company thereupon became the holder of $71,732,062 par value of common stock, the real value of which at $135 for $100 par value is $96,838,-283. The deduction from the $41,085,000 par value of the preferred stock of the Northern Pacific Railway Company of the $37,023,000 par value of such stock, the surrender of which to that company for cancellation was necessary for the acquisition of the $34,709,062 of its new common stock, left a balance of $4,062,000 par value of its preferred stock. If this balance was sold or disposed of at par,— and it may reasonably be inferred from the affidavits and exhibits that it was not sold or disposed of for less,—its proceeds, $4,062,000 fairly may be treated as an offset to the cash payment of $8,915,629, originally made by the Northern Securities Company to Harriman and Pierce. On this theory the balance of the $8,915,629 over the $4,062,000, amounting to $4,853,629, when deducted from $96,838,-283, the present real value of the $71,732,062 par value of the common stock of the Northern Pacific Railway Company, leaves a balance of $91,984,654. From this balance would be deducted $83,181,-488 which the complainants would receive under the pro rata plan, leaving $8,803.166 in their favor, less the amount of their share of

the above mentioned residue in the treasury of the Northern Securities Company and a just allowance of interest on the cash balance. The above mentioned sum of $8,915,629, paid by the Northern Securities Company to Harriman and Pierce November 18, 1901, had been loaned to that company by the firm of J. P. Morgan & Company. On or about January 1, 1902, $6,375,938 par value of the $41,085,000 par value of preferred stock of the Northern Pacific Railway Company originally transferred by Harriman and Pierce to the Northern Securities Company, having previously been surrendered to the Northern Pacific Railway Company and retired, its proceeds, amounting to its par value, were paid by the Northern Securities Company to J. P. Morgan & Company in partial liquidation of the cash loan of $8,915,629 made by that firm to the latter company. The affidavits and exhibits furnish evidence of some weight that the above mentioned par value of $6,375,938 of preferred stock of the Northern Pacific Railway Company was deducted by the Northern Securities Company from the $41,085,000 par value of preferred stock of that railway company, thereby reducing the latter amount to $34,709,062 at par, and that the remaining preferred stock, namely, $34,709,062 par value was, through the instrumentality of convertible certificates issued by the Northern Pacific Railway Company converted into new common stock of equal par value. If such be the case, the claim of the complainants would extend to the $37,023,000 par value of the old common stock, and the $34,709,062 par value of the new common stock, aggregating $71,732,062 par value of common stock, having a real value of $96,838,283. The deduction from this amount of $2,539,691, representing the difference between the original cash payment of $8,915,629 and $6,375,938, proceeds of preferred stock retired, should be deducted from the total amount leaving a balance amounting in real value to $94,298,592. Deducting from this amount $83,181,488, which the complainants would receive under the proposed distribution, leaves $11,117,104 in their favor, less the amount of their share of the residue in the treasury of the Northern Securities Company after the proposed distribution. There should also be a further deduction of such sum by way of interest on cash received as above stated by Harriman and Pierce from the Northern Securities Company as may be just. This item, however, would be of comparative insignificance in its relation to the other values involved in the suit. In a journal of the Northern Securities Company is the following entry:

"1901.
Novbr. 18th.

Investment Account No. 1.
To Capital Stock a/c.

For 410,850 shs. N. P. Pfd. stock bought from E. H. Harriman and Winslow S. Pierce for...................................... $41,085,000
Less paid in cash as per entry in cash book this day.............. 8,915,629

Balance paid in stock................................. $32,169,371
say 321,693 shs. & $71 scrip issued as fully paid up stock @ par."

132 F.—31

Whatever may be the merit of this entry as viewed from the standpoint of scientific bookkeeping, the words and figures "Balance paid in stock $32,169,371," are, when considered in connection with other exhibits and the affidavits, confusing and misleading in their bearing upon the conversion, whether directly or indirectly, of preferred stock of the Northern Pacific Railway Company originally turned over by Harriman and Pierce to the Northern Securities Company into new common stock of the former company. Any assumption that the above mentioned balance of $32,169,371 par value of preferred stock of the Northern Pacific Railway Company was not converted, either at par or on the seventy five eightieths basis, into new common stock of that company, by the Northern Securities Company, appears irreconcilable with controlling evidence touching the conversion of preferred into common stock, furnished by the affidavits and exhibits considered as a whole. A fact, which on the present showing seems indisputable, is that the Northern Securities Company, in addition to the $37,023,000 par value of the common stock of the Northern Pacific Railway Company originally turned over to the former company by Harriman and Pierce, acquired through the instrumentality of convertible certificates issued by the railway company new common stock of the par value of $34,709,062. It is unimportant, so far as the point under immediate discussion is concerned, whether that amount of new common stock was secured, on the one hand by a surrender to the railway company of $37,023,000 par value of its preferred stock on the seventy five eightieths basis, or, on the other, by a surrender to the railway company of its preferred stock of the par value of $34,709,-062 for its new common stock of the same par value. It is not claimed or suggested that the balance of $32,169,371 par value of preferred stock, mentioned in the journal entry, was sold by the Northern Securities Company absolutely for cash and without intention on its part, directly or indirectly, to convert such balance of preferred stock into the new common stock of the Northern Pacific Railway Company. Any such contention would, on the present showing, be wholly inadmissible. The affidavits and exhibits fail to disclose, and counsel have not attempted to explain, how that balance of preferred stock was, or, on any basis or theory justified by the evidence, could have been, converted into $34,709,-062 par value of the new common stock of the Northern Pacific Railway Company. Yet, if, notwithstanding the foregoing considerations, it be assumed that only $32,169,371 par value of the original $41,085,000 par value of preferred stock of that railway company, transferred by Harriman and Pierce to the Northern Securities Company was converted into the new common stock of the railway company of an equal par value, the old and new common stock would aggregate $69,172,371 par value or a real present value of $93,409,701. The deduction from the latter amount of the $83,-181,488 which the complainants would receive under the proposed pro rata distribution would leave a balance of $10,228,213 of real value in their favor, less the amount of their participation in the residue of the property remaining in the treasury of the Northern

Securities Company. Or, further, if it be assumed that the $32,-169,371 par value of preferred stock of the Northern Pacific Railway Company was converted into new common stock of that company on the basis of seventy five eightieths, it would represent $30,158,-785 par value of new common stock, the real value of which is $40,714,360. This latter sum added to $49,981,050, representing the real value of $37,023,000 par value of the old common stock would aggregate $90,695,410, and the deduction from this sum of the $83,-181,488 which the complainants would receive under the proposed distribution, would leave a balance of $7,513,922 of real value in their favor, less their share of the residue of the property in the treasury of the Northern Securities Company.

The stock of the Northern Securities Company outstanding April 21, 1904, and presumably now outstanding, is of the par value of $395,400,000, divided into 3,954,000 shares of the par value of $100 each. That company now holds 1,537,594 shares of the stock of the Northern Pacific Railway Company and 1,181,242 shares of stock of the Great Northern Railway Company, of the par value of $100 each. The proposed pro rata plan of distribution contemplates the reduction of the total outstanding stock of the Northern Securities Company by 99 per cent. To accomplish this result the Northern Securities Company offers, on the surrender to it of that proportion of its stock, amounting at par to $391,446,000, to deliver or pay for each $100 par value thereof surrendered $39.27 par value of stock of the Northern Pacific Railway Company, and $30.17 par value of stock of the Great Northern Railway Company, and "proportional amounts thereof for fractional shares of the stock of this company." $39.27 on each $100 of $391,446,000 so closely approximates to the par value of the 1,537,594 shares of stock of the Northern Pacific Railway Company that for any practical purpose on the present application it may be considered equal to it. And $30.17 on each $100 of $391,446,000 so closely approximates to the par value of the 1,181,242 shares of stock of the Great Northern Railway Company that for any such purpose it may be considered equal to it. Thus, the surrender of ninety nine one hundredths of the outstanding stock of the Northern Securities Company would necessarily involve the transfer and alienation by it of practically all the stock of the Northern Pacific Railway Company and Great Northern Railway Company now held by it. Whatever of real value the remaining one hundredth of the par value of the outstanding stock of the Northern Securities Company, $3,954,000, might represent, would consist wholly, or practically wholly, of property other than stock of both or either of the two railway companies. It does not appear from the affidavits and exhibits what amount of property would remain in the treasury of the Northern Securities Company after the distribution of the railway stock referred to. Nor does it appear whether the company is or is not indebted, nor whether there are or are not other charges or expenses paramount to the claims of the holders of the remaining one hundredth of its stock. As between the complainants applying for a preliminary injunction, and the Northern Securities Company resisting the application

partly on the ground that the real value in dispute is not sufficient to warrant an exercise of the injunctive power, the burden of showing the amount of property in which the complainants would share under the proposed plan, clearly, in view of the fact that the company is chargeable with full knowledge of the character, amount and condition of its own property and finances, rested upon it. It must be presumed to have been able to make such a showing. Its failure so to do gives rise to an unfavorable inference. But even if it be assumed that the real value of the residue of the property would be $3,954,000, the par value of the remaining stock, the complainants would under the proposed plan, in the absence of any reduction or obliteration of the fund through possible indebtedness or other charges or expenses, receive as their share approximately $824,919. This sum, though a large amount, is but a small proportion of the real value which the complainants would receive, if entitled to recover. It is less than one twelfth of $11,117,104; less than one eleventh of $10,228,213; less than one ninth of $8,803,166; and less than one eighth of $7,513,922. It is unnecessary, and would be tedious, to discuss in this connection and on the present application the subject of interest, as at most it is a matter of comparative insignificance. In leaving the discussion of real values involved in this suit it should be borne in mind that the right of the complainants to recover, if it exists, extends to stock of the Northern Pacific Railway Company, amounting on the present showing to from $69,000,000 to $71,000,000 approximately at its par value, and to a much larger sum at its real value, and that they disclaim all right to the stock of the Great Northern Railway Company which the Northern Securities Company insists should be taken by them, instead of the larger amount of the stock of the Northern Pacific Railway Company claimed by them. From this point of view there possibly may be some doubt of the pertinency of the foregoing discussion of balances of real values to the consideration of the propriety of granting or withholding the injunction. On this point no opinion is expressed. It was urged by the defense at the hearing that the granting of the relief sought by the complainants would be injurious to many stockholders of the Northern Securities Company, other than the complainants, who acquired their stock in good faith and for full consideration, for the reason that in many instances and to a large amount stock of that company had been so issued or transferred as to render it impossible to trace or identify the consideration of such issue or transfer. It appears that prior to April 9, 1903, stock of the Northern Securities Company of the par value of $7,522,000 was issued for cash used in the purchase of stock of the Great Northern Railway Company and other stocks held by the Northern Securities Company, and also that its stock to a large amount has been transferred from time to time among and is now held by a large number of persons. The bill avers that those becoming stockholders of the Northern Securities Company, whether for shares of the Northern Pacific Railway Company or the Great Northern Railway Company or for cash, had full knowledge and information of the purposes for which the

first-named company was organized, and the affidavits are conflicting on the question whether or not the nature and amount of the consideration for the issue or transfer of stock of that company can be traced and identified on its books or otherwise. It is manifestly improper that these matters should be decided on the fragmentary and inconclusive evidence now before the court. They require deliberate investigation in the accustomed mode on evidence taken in due course and in the light of an examination of books and papers produced before a master. It should also be borne in mind that this court, as a court of equity, has power so to mold its decrees and impose such terms as may be necessary to protect the equities of persons who may be affected by its action.

Language justly applicable to the present case was employed by Judge Sanborn in Denver & R. G. R. Co. v. United States, 124 Fed. 156, 161, 59 C. C. A. 579, 584, as follows:

"The case falls well within the established rule that a preliminary injunction maintaining the status quo may properly issue whenever the questions of law or of fact to be ultimately determined are grave and difficult, and injury to the moving party will be immediate, certain, and great if it is denied, while the loss or inconvenience to the opposing party will be comparatively small if it is granted."

An appeal does not lie from an interlocutory decree of this court denying a preliminary injunction. While this consideration is entitled to no weight where, on the application for an injunction, it clearly appears that the complainant cannot prevail on the final hearing, it is often of controlling importance where, on such application, there is room for reasonable doubt as to the ultimate result. Under the circumstances, this court would not be justified in refusing the injunction sought. Such refusal would not be an exercise of sound judicial discretion. It would not only be improvident in the extreme, but betray peculiar insensibility to the fallibility of human judgment so often accentuated by differences of opinion in even the highest judicial tribunals.

An interlocutory decree for a preliminary injunction may be prepared and submitted.